The plaintiff is the mother and administratrix of Conie Childers, who died on or about 24 May, 1930. The defendant is the head physician and surgeon of Richard Baker Hospital and controlled the same by virtue of a lease from Dr. J. H. Shuford.
The plaintiff alleged that on or about 18 May, 1930, her son, who was then 22 years of age, while riding in a motor vehicle driven by another party at a rapid and reckless rate of speed, was suddenly thrown from the vehicle in turning a curve, and as a result thereof his head struck a telephone pole, fracturing his skull and otherwise injuring him to such an extent that he was rendered unconscious; that the injured man was immediately carried by automobile to the hospital of the defendant by his companions, and that the defendant accepted plaintiff's intestate as a patient, but failed to use ordinary care and skill in the diagnosis and treatment of said patient so as to ascertain the extent of his injuries and failed to make an X-ray examination of the head of plaintiff's intestate. That after keeping the unconscious man in the hospital for a short period of time the defendant abandoned the treatment of the injured man and directed that he be returned to his home, a distance of about eight miles, and that a few days thereafter plaintiff's intestate died as a result of concussion of the brain, and this action was instituted to recover damages upon the theory that the *Page 44 
defendant had failed to make a proper examination of plaintiff's intestate in order to discover the extent of his injuries and had negligently abandoned the treatment of his patient.
The defendant filed an answer denying that he had accepted the plaintiff as a patient and further alleging that plaintiff was brought into his hospital temporarily, in an intoxicated and unconscious condition, and that the companions of the injured man took him home with instructions from the defendant to return him to the hospital after he was sober, but that he was never returned to the hospital and the defendant never requested to render any treatment.
The testimony tended to show that Conie Childers, after being thrown from the car, was taken to the hospital of defendant in Hickory by two or three of his companions. The narrative of the event is as follows: We drove up in front of the hospital. Lowman blew his horn and a lady came out. He said, "We have a patient for you." She said, "Drive around to the other side," and we drove up and she rolled a carriage out and laid him on it. She said, "Is he drunk?" I said "No, he might have been drinking, but he is not drunk." I went into the operating room and Dr. Frye and Chief Lentz and some other policemen were all in the operating room. Dr. Frye said, "You can take him on home or I will turn him over to the policemen." He was talking to me. I do not remember whether Mr. Lowman was in there at the time, but the nurse was in there. I said, "I will take him home." Mr. Lentz said, "Since you are from Burke County, I will let you take him home." Dr. Frye had said, "You can take him home or I will turn him over to the police; I cannot keep him." And I said, "I will take him home." We rolled him on the outside, or I had the nurse to roll him out. . . . I did not hear Dr. Frye say anything about bringing him back to the hospital if he did not get better. . . . He was unconscious all the way home. We got home with him about six o'clock. . . . I either told the nurse or Dr. Frye that he was slung off the truck against a telephone pole, but I do not remember which one. After we got him home, I next saw him about an hour and a half later when Dr. Flippin got there. I don't know whether Conie Childers had had a drink, but he talked like it. I told the woman at the hospital that he might have been drinking, but that he was not drunk. I had heard him talk like a drunk man, and came to the conclusion that he was drinking. . . . I did not ask Dr. Frye to examine him, and neither Lowman nor Mostellar asked him in my presence. . . . Dr. Frye told me that we could take him home or he would have to turn him over to the police officers; that he could not keep him. Another witness for plaintiff testified that when Dr. Frye came to the hospital and saw the injured man he said, "Do you know this young man?" I said, "Yes, sir." He said, *Page 45 
"Is he capable of drinking?" I said, "No, not as I know of much." I have seen him with a drink in him. Dr. Frye said, "He is drinking now," and he called me up there to smell his breath, which I did, and I smelled just a little touch of it — just could smell something or another that smelled like it. He was dressing his right eye when I went in and he got through with that, and then he examined his arms while he was in there, worked them up and down, and his legs, and felt over his head and says, "That is all we can do. Take him home or I will turn him over to the cops."
There was further evidence tending to show that in a few hours after Conie Childers reached his home Dr. Flippin was called to treat him, and later on Dr. Corpening. Both of these physicians were examined in behalf of plaintiff, and both were physicians of note and accepted repute and skill.
At the conclusion of plaintiff's evidence there was judgment of nonsuit, and the plaintiff appealed.
There are only two exceptions in the record. The first is to the ruling of the trial judge sustaining the motion for nonsuit, and the other is entirely formal. Therefore, the question of law to which all others are subsidiary is whether there was sufficient evidence to be submitted to the jury tending to establish the relationship of physician and patient between the deceased and the defendant. The duties which a physician owes to his patient have been established by several decisions, notably Long v. Austin,153 N.C. 508; Mullinax v. Hord, 174 N.C. 607; Brewer v. Ring, 177 N.C. 476;Thornburg v. Long, 178 N.C. 589; Nash v. Royster, 189 N.C. 408;Smith v. Wharton, 199 N.C. 246. These principles, however, apply when the professional relationship has been established. "A physician or surgeon is not bound to render professional services to every one who applies, and he may, therefore, by notice or special agreement, limit the extent and scope of his employment. Such is the simple law of contract."Nash v. Royster, supra. Of course a physician or surgeon could not make a contract with an unconscious man, and hence the ultimate test of liability would depend upon whether the physician actually accepted an injured person as a patient and undertook to treat him. Upon conflicting testimony, such undertaking or acceptance would ordinarily raise an issue for the determination of a jury. In the case at bar all the evidence tends to show that when the injured man was brought into the hospital that the defendant looked him over, and upon discovering *Page 46 
that the patient had been drinking, declined to accept him as a patient or to undertake the necessary treatment. Conceding that the defendant was not justified in assuming that Conie Childers was drunk, still the law did not compel him to accept the injured man as a patient.
Moreover, there is no evidence tending to show that the refusal of defendant to accept plaintiff's intestate as a patient or to make a more thorough examination was the proximate cause of his death. Indeed, the patient was treated by two physicians possessing and employing, so far as the record discloses, the requisite skill and care.
Affirmed.