218 So.2d 221 (1969)
Betty J. TUCKER, Joined by Her Husband, Waters B. Tucker, Appellants,
v.
AMERICAN EMPLOYERS INSURANCE COMPANY, a Foreign Corporation Authorized to Do Business in the State of Florida, et al., Appellees.
No. 954.
District Court of Appeal of Florida. Fourth District.
January 20, 1969.
Rehearing Denied February 21, 1969.
Joseph D. Farish, Jr., and John D. Kaylor, of Farish & Farish, West Palm Beach, for appellants.
James E. Tribble, of Blackwell, Walker & Gray, Miami, for appellee American Employers Ins. Co.
REED, Judge.
The complaint, as amended, alleged that the plaintiffs, Betty J. Tucker and her husband, Waters B. Tucker, filed a suit in the Circuit Court of Palm Beach County seeking damages because of the alleged negligent injury of the plaintiff Betty J. Tucker by one Benjamin Stendig. As a result of that suit, the defendant American Employers Insurance Company and the defendant Jack W. Harwood doing business as Harwood Bureau of Investigation conducted a surveillance of the plaintiff Betty J. Tucker for the purpose of annoying, harassing and intimidating her into a settlement of her claim against Benjamin Stendig for less than she otherwise would accept.
Both of the defendants by answer admitted that the plaintiff Betty J. Tucker was secretly surveilled by the defendant Jack W. Harwood who was employed for that purpose. The defendants' answers denied the other material averments in the complaint.
The defendants filed motions for summary judgment one of which was accompanied by an affidavit of Carl W. Geisler and John Bolduc, both of whom were employees of the defendant Jack W. Harwood during the time of the alleged surveillance of the plaintiff Betty J. Tucker. The motions were based on these affidavits, answers to interrogatories by defendant Jack W. Harwood which in essence denied that he made any surveillance of the plaintiff Betty J. Tucker except that which was described in the aforementioned affidavits of his employees, and depositions, particularly those of the plaintiffs.
*222 The trial court granted the motions and entered a summary judgment for the defendants on 20 June 1966. It is from this final judgment that the plaintiffs appeal.
The question presented here is whether or not the defendants were entitled to a summary judgment on the basis of the pleadings, depositions, affidavits and answers to interrogatories. As stated by the defendant American Employers Insurance Company the only point to be determined on appeal is:
"Whether the trial court erred in entering summary judgment in favor of the defendants on the ground that (1) the defendants did not harass or intimidate the plaintiffs in any manner and (2) that there was a lack of evidence as to the identity of any person whose acts might constitute harassment."
Since all parties here agree on the point presented, we are not called upon by the state of the record to explicate the elements of and limitations on the cause of action which the plaintiffs have attempted to assert for a violation of the right of privacy.[1]
The affidavit of Carl W. Geisler, an employee of the defendant Jack W. Harwood described as his only efforts at surveilling the plaintiff six occasions between November 11, 1962 and January 16, 1963 on which he attempted to view the plaintiff from his motor vehicle which was lawfully parked or traveling on public streets. None of the attempts described in Mr. Geisler's affidavit were made at night or involved a trespass on the plaintiff's property. The other affidavit, that of John Bolduc, also an employee of the defendant Jack W. Harwood, stated that Mr. Bolduc's only attempt at surveillance of Betty J. Tucker occurred on November 20, 1962 when he interviewed the plaintiff at her home under the pretense of a desire to enroll his children in a nursery school which she had operated.
The plaintiffs and defendants both relied on the deposition of the plaintiff Betty J. Tucker. Mrs. Tucker described numerous occasions at night when she had heard a person standing outside of her house close to a window or a screened porch following which footprints were usually discovered in plaintiffs' garden area adjacent to the house. On one occasion, late at night, the plaintiff, after having just gotten out of the shower, noticed a man peering through her living room window. The plaintiff's husband by his deposition corroborates this event and places it in November or December of 1962.
The plaintiff Betty J. Tucker also testified to occasions when she was followed by someone in a motor vehicle. On one of these occasions, the plaintiff left her home at 10:30 or 11:00 p.m. to take an item to the firehouse where her husband worked, a distance of about four miles. She stated that she was followed by a man in a white panel truck to within a block of the firehouse. She stayed at the firehouse until about 1:30 a.m. After she left the firehouse, a white panel truck followed her to within several blocks of her home. This incident occurred relatively close in point of time to another similar incident when the plaintiff was followed during day time hours to and from a doctor's office in Fort Lauderdale. The latter surveillance was the act of the defendant Jack W. Harwood and his employee, Carl W. Geisler, as shown by the latter's affidavit which dates the occurrence at January 16, 1963.
Other nocturnal efforts at surveillance were testified to by Mrs. Tucker and a witness, Barbara Ann Houck, at whose home some of these incidents occurred.
On no occasion were the plaintiffs or anyone else able to identify the persons allegedly surveilling Mrs. Tucker at night and on her premises.
*223 The depositions of the plaintiffs and Barbara Ann Houck, when read together, indicate that the surveillance which involved the trespasses and other night time activities occurred generally from September of 1962 to January of 1963. This period roughly coincides with the period from November 11, 1962 to January 16, 1963 during which the defendants admitted conducting a surveillance of the plaintiff Betty J. Tucker.
The thrust of the defendants' argument is that the surveillance which they have admitted by affidavits of Mr. Geisler and Mr. Bolduc and the answers to interrogatories by Mr. Harwood was reasonable and lawful in view of the fact that the plaintiffs had previously filed a suit against an insured of the defendant American Employers Insurance Company. For this proposition they cite Forster v. Manchester, 1963, 410 Pa. 192, 189 A.2d 147. We agree with this contention and the authority cited by defendants. We do not, however, agree with the next step in the defendants' argument, and that is that no issue of fact existed with respect to defendants' responsibility for the surveillance which the plaintiffs described as involving trespasses on their home property at night and late night following of the plaintiff as she drove to and from her husband's place of employment.
Even though the plaintiffs were unable to identify the trespassers or the driver of the white panel truck that followed the plaintiff Betty J. Tucker and the conduct of these activities was flatly denied by the defendants by sworn statements, it is our opinion that the coincidence in time between the obnoxious surveillance and the innocuous surveillance admitted to by the defendants together with the admission of the defendants that the defendant Jack W. Harwood was employed to conduct a secret surveillance of the plaintiff Betty J. Tucker, indicate the existence of a genuine issue of material fact as to the defendants' responsibility for the obnoxious surveillance.
We are of the view that the granting of a summary judgment for the defendants in this case required the weighing of conflicting inferences and an assessment of the credibility of interested witnesses in order to conclude that no genuine issue of material fact existed, and this process is not available in passing on a motion for summary judgment, Strode v. Southern Steel Construction Co., Fla.App. 1966, 188 So.2d 690; Berlanti Construction Co. v. Miami Beach Federal Savings and Loan Association, Fla.App. 1966, 183 So.2d 746; and Harvey Building, Inc. v. Haley, Fla. 1965, 175 So.2d 780, 783.
For the foregoing reasons, the summary judgment for the defendants is reversed and the cause remanded.
WARREN, LAMAR, Associate Judge, concurs.
WALDEN, C.J., dissents, with opinion.
WALDEN, Chief Judge (dissenting).
I respectfully dissent because the record does not disclose the existence of a "genuine issue" of material fact as to defendants' liability. F.R.C.P. 1.510(c), 31 F.S.A. More specifically, there is no evidence or allowable inference which would reflect that defendants conducted an illegal surveillance as alleged by plaintiffs. Thus, the trial court acted in accordance with law when this unworthy claim was terminated by entry of summary judgment thereby exonerating the defendants. It is my view that the judgment should be affirmed.
The gravamen of plaintiffs' complaint is that defendants subjected plaintiff, Betty J. Tucker, to an illegal surveillance for the purpose of forcing settlement of her then pending negligence suit for personal injuries to plaintiffs' disadvantage.
Dates are important. It is to be remembered that the accident which was the subject of plaintiffs' negligence suit occurred in April 1962. The admitted legal surveillance *224 took place on several occasions between November 11, 1962, and January 16, 1963, a period of about ten weeks. Finally, plaintiffs claim that the acts supposedly constituting the illegal surveillance took place loosely from mid-September, 1962, to late January, 1963, a period of about 16 weeks.
Defendants flatly denied under oath that they committed or were in any way responsible for any of the alleged illegal acts. On the other hand neither the plaintiffs nor anyone on their behalf could identify any person conducting or involved in the claimed illegal surveillance. And it is nowhere suggested that direct identification exists elsewhere or sometime in the future.
In this posture of the case, the only method whereby liability could be attached to defendants or a genuine issue as to it created is by the use of inferences.
What is an inference? Black's Law Dictionary, Fourth Edition, defines it as:
"In the law of evidence. A truth or proposition drawn from another which is supposed or admitted to be true. A process of reasoning by which a fact or proposition sought to be established is deduced as a logical consequence from other facts, or a state of facts, already proved or admitted. Whitehouse v. Bolster, 95 Me. 458, 50 A. 240; Joske v. Irvine, 91 Tex. 574, 44 S.W. 1059."
With due and abiding respect for my colleagues and for the scholarship reflected in the majority opinion, they appear to have based potential liability upon such an inference. I presume to repeat the critical dispositive portion of the majority opinion in order to pinpoint our differences:
"* * * it is our opinion that the coincidence in time between the obnoxious surveillance and the innocuous surveillance admitted to by the defendants together with the admission of the defendants that the defendant Jack W. Harwood was employed to conduct a secret surveillance of the plaintiff Betty J. Tucker, indicate the existence of a genuine issue of material fact as to the defendants' responsibility for the obnoxious surveillance."
Thus, my brethren find an allowable inference sufficient to defeat summary judgment arising out of the coincidence in time when the admitted legal surveillance is compared to the alleged illegal surveillance. Different from the majority opinion, it is my view that such coincidence is not real and that it is insufficient as a matter of law to constitute a cognizable inference.
Turning to the record, Mrs. Tucker, in support of her claim of illegal surveillance during the 16 week period about which she complains, said she heard unusual noises at night, her gate squeaked, her crotons scraped against her window, a face peered at her through a window at a friend's house and someone looked through her living room window. Also, she had been followed by a white panel truck. Her testimony as to the happenings and dates was vague and she was unable to supply the chronology of the alleged events. Mr. Tucker said he had seen footprints outside their home and a face in the window of their home. A family friend deposed that on three occasions when Mrs. Tucker visited her an unidentified man was seen prowling nearby.
It is reiterated that no one could identify any of the prepetrators and no one knew in fact or could explain the purpose behind or accompanying the commission of the complained of acts. In other words, the "who?" and the "why?" are left for conjecture.
But the undisputed record contains more. The apparent time coincidence between defendants' admitted surveillance and the illegal acts charged by plaintiff disappears upon closer scrutiny. The record reveals that Mrs. Tucker has had a long and oftrenewed acquaintance with the Lake Worth Police Department. Complaint records of that department reveal the following reports *225 made by Mrs. Tucker, or in one instance by Mr. Tucker at Mrs. Tucker's insistence, between October 19, 1961, and May 21, 1966:

 October 19, 1961 Reported noise in her back yard. Investigating
 officer found complaint unfounded.
 October 19, 1961 Again reported noises; again officer found
 nothing.
 October 28, 1961 Reported disturbance. Officer found bicycle
 tracks and tipped over garbage can.
 April 26, 1962 Reported prowler; complaint unfounded.
 May 21, 1962 Reported motorcycles racing on street;
 complaint unfounded.
 November 28, 1962 Reported men following her in a white G.M.C.
 panel truck, license number 6 G/K 1449,
 registered to a W. Dewey Patrick of West
 Palm Beach, not otherwise identified. The
 Complaint Report contained the following
 observation. "Complainant is in the habit of
 driving all over town during the early morning
 hours, by herself, and it's surprising that
 we don't have a complaint of this type more
 often."
 May 4, 1964 Reported prowler; officer found nothing.
 May 4, 1964 Reported a scream for help. Investigating
 officer found nothing.
 May 31, 1964 Reported prowler; officer found nothing.
 June 3, 1964 Reported screaming; officer found "hen"
 party with a record player.
 August 12, 1964 Reported her son had found dynamite sticks
 in their car. They were some type of magnesium
 flare.
 December 17, 1964 Reported prowler. Officer found nothing.
 June 21, 1965 Reported someone threw eggs on her car
 windshield.
 July 11, 1965 Reported prowler on past two nights. Officer
 found nothing.
 October 6, 1965 Reported someone trying to break in rear door.
 Officer found nothing.
 March 30, 1966 Reported prowler. Officer found nothing.
 April 2, 1966 Heard a noise.
 May 21, 1966 Reported gunshots. Officer found area quiet.

*226 Thus, as shown, Mrs. Tucker was plagued by very many alleged prowlers and noises. Her complaints covered a span beginning on October 19, 1961, that date being six months prior to the happening of the accident which is the subject of the suit Mrs. Tucker says the defendant insurance company is trying to force her to unfairly compromise. The complaints continued until May 1966, a period of three years and three months after the cessation of the alleged illegal surveillance. It is of interest to note that the police authorities largely found her complaints without foundation or of innocent explanation. During the whole career of complaints from 1961 to 1966, there is no factual basis for a finding of anything sinister, illegal or conspiratorial.
It is to be noted that the complaints are all the same caliber and there is no criteria or basis in the record for a selection of the events during the mentioned 16 week period as contrasted to the events outside that period. In other words, the time coincidence, if there was one, is simply of the Tuckers' naked making. It is further of rather critical interest that the Tuckers seemingly reported even the most innocuous events during the five year period to the police. However, the Tuckers, as to the happenings at their home, did not see fit to report the events which they claim amounted to illegal surveillance with the exception of the panel truck incident which was negatively shown by license number and name not to be identified with defendants.
In summation, this writer can find nothing deserving of notice as a matter of fact or law which would reflect a coincidence in dates, absent which plaintiffs are utterly without a case.
But for the purposes of this dissent let us suppose that a coincidence does somehow exist. Even so, plaintiffs are still subject to adverse summary judgment.
Plaintiffs' cause collides fatally with the law concerning pyramided inferences. Close analysis of this case reveals that two fundamental inferences are involved. Before a genuine issue can be created, these two inferences must be legally established and pyramided.
First, it is necessary to infer from the depositions and affidavits that Mrs. Tucker was actually subjected to an illegal surveillance. In other words, the strange noises, croton scrapes, gate squeaks, prowlers and so forth must be established as acts of illegal surveillance designed to force Mrs. Tucker into a disadvantageous settlement of her pending law suit, rather than figments of her imagination or actions and events susceptible of other reasonable explanation.
Second, building on and pyramiding upon the first inference, it is necessary to infer that defendants conducted or were responsible for such illegal surveillance.
What is the law concerning pyramided inferences?
The Supreme Court of the State of Florida, in Voelker v. Combined Ins. Co., Fla. 1954, 73 So.2d 403, 407, held that the "inference upon inference" rule should not
"* * * be construed to mean that under no conceivable circumstances may one inference be deduced from another. We think, however, that such method of establishing an ultimate fact should not ordinarily be indulged unless the first inference meets a test which may be analogized to the criminal rule concerning circumstantial evidence, i.e., in the ordinary case, only if the prior or basic inference is established to the exclusion of any other reasonable theory should another be drawn from it."
The case of New York Life Ins. Co. v. McNeely, 1938, 52 Ariz. 181, 79 P.2d 948, cited in Voelker, supra, contains further elaboration of the rule against pyramided inferences.
"* * * [T]he prior inferences must be established to the exclusion of any other reasonable theory rather than merely by a probability, in order that the last inference of the probability of the ultimate *227 fact may be based thereon. This rule is not based on an application of the exact rules of logic, but upon the pragmatic principle that a certain quantum of proof is arbitrarily required when the courts are asked to take away life, liberty or property.
* * * * * *
"* * * [W]hile it is permissible to draw successive inferences, each inference, except the last one, in order to be used as a link in a chain of inferences, must be established to the exclusion of any other reasonable theory, rather than merely by a probability."
See, in addition, I, Wigmore on Evidence, § 41, which quoted the above with approval; Commercial Credit Corp. v. Varn, Fla.App. 1959, 108 So.2d 638.
Justice Thornal in Commercial Credit Corp. v. Varn, supra, stated the rule in this language:
"* * * The rule is clear, however, that the inference of the existence of an essential fact to be drawn from circumstantial evidence cannot be made the basis of a further inference of an essential fact, unless it can be said that the initial inference was established to the exclusion of any other reasonable inference.
"[4, 5] Ordinarily, the rule with reference to inferences based on circumstantial evidence is different in civil actions from the rule which applies in criminal matters. In civil cases if the proved circumstances justify an inference pointing to an essential fact which inference outweighs all reasonable inferences to the contrary, it can then be said that a conclusion as to the existence of the ultimate fact is justified by the circumstantial evidence. Tucker Brothers, Inc. v. Menard, supra [Fla. 1956, 90 So.2d 908]. However, the established rule of evidence is that we cannot construct a conclusion upon an inference which has been superimposed upon an initial inference supported by circumstantial evidence unless the initial inference can be elevated to the dignity of an established fact because of the presence of no reasonable inference to the contrary."
It is manifest that the aforementioned "first inference" that the alleged acts constituted an illegal surveillance designed to force Mrs. Tucker into a disadvantageous settlement of her tort claim has not been established to the exclusion of any other reasonable theory. Here the effort falls far short of the mark. The failure is so palpably gross as to be properly subject to declaration or decision as a matter of law. The scrape of crotons could reasonably have been caused by the wind. Under the record circumstances reflecting her very frequent complaints one would be strongly justified in believing that the alleged events were simply the product of an over active imagination. Who of us has not on some occasion been given a start by believing a face was at the window only to find upon investigation that the image was created by shadows from shrubbery, etc.? Footprints are susceptible of many innocent and reasonable explanations. These, along with other events such as a prowler, could be explained by a "peeping tom", a lost drunk or, in fact, a prowler unconnected to defendants. Since this inference fails of establishment to the exclusion of any other reasonable inference or theory, the case falls as the second cannot then be pyramided with it.
As concerns the second or last inference, the identity of the alleged perpetrators, I feel that it has already been shown that it fails its test of "probability" as mentioned in the Voelker case, infra.
Thus, in my view, neither of the required inferences were in anywise established, thus leaving no probative evidence to support plaintiffs' case. As to defendants' liability, the only thing shown was that defendants conducted a legal surveillance as they had a right to do. I cannot infer from this lawful conduct alone *228 that defendants conducted an illegal surveillance. At the very most and resolving everything in plaintiffs' favor, their case rests solely upon weak suspicion and speculation.
Is weak suspicion and speculation sufficient to defeat summary judgment? No. The criteria is mentioned in F.R.C.P. 1.510 (c). There must exist a "genuine issue" of material fact as to defendants' liability and such is nowhere to be found in the record of this case.
What is a "genuine issue" as contemplated by the summary judgment rule F.R.C.P. 1.510(c)?
"Genuine issue of fact," as that phrase is used in Fed.R.Civ.P., Rule 56, the Federal counterpart to our summary judgment rule, was defined in Durasteel Co. v. Great Lakes Steel Corp., 8 Cir.1953, 205 F.2d 438, 441, as follows:
"An issue of fact is not genuine unless it has legal probative force as to a controlling issue, 35 C.J.S. Federal Courts § 144, p. 1205."
See also Elbow Lake Coop. Grain Co. v. Commodity Credit Corp., 8 Cir.1958, 251 F.2d 633; and Robert L. Ferman & Co. v. General Magnaplate Corp., 1963, 33 F.R.D. 326.
"Genuine issue" has also been defined as one which can be sustained by substantial evidence, Riss & Co. v. Association of Am. Railroads, D.D.C. 1960, 190 F. Supp. 10, or as a triable issue, Brown v. B & G Crane Service, Inc., La. App. 1965, 172 So.2d 708.
"A mere scintilla of evidence is not enough to create an issue, there must be evidence on which a jury might rely." 3 Barron & Holtzoff, Federal Practice and Procedure, § 1234.
In Florida "genuine issue" has been defined as "a real as distinguished from a false or colorable issue." Harrison v. Consumers Mtg. Co., Fla.App. 1963, 154 So.2d 194.
However much illumination these definitions supply, there remains the problem of application to a particular case. In 6 Moore's Federal Practice, at p. 2286, the following principle is expressed:
"On the great bulk of issues, however, no rigid or magical formula can be offered to determine the existence of a genuine issue of material fact. Here, on last analysis, a problem of judging is involved."
Thus, from my understanding, a genuine issue is not an issue based upon mere suspicion, speculation, pretense, conjecture or upon nonprobative evidence. See generally, 35B C.J.S. Federal Civil Procedure § 1142b.
It is well to remember and remind that summary judgments serve a real and valuable purpose. "The fundamental purpose for the summary judgment procedure is to relieve the litigant and the court from the trial of unnecessary lawsuits." General Truck Sales, Inc. v. American Fire & Cas. Co., Fla.App. 1958, 100 So.2d 202.
The zeal of our courts in protecting and saving inviolate the right of the citizens to have a jury trial is, of course, praiseworthy. See 35B C.J.S. Federal Civil Procedure, § 1136, 30 Fla.Jur., Summary Judgment, § 8. But this zeal can be overdone and taken to a point beyond and in violation of the requirements of law and common sense. When such imbalance is reached the summary judgment rule is emasculated, leaving unfortunate consequences.
It is as equally unjust to deny summary judgment and make a litigant respond and suffer a jury trial when there is involved only a frivolous and non-genuine issue, be it complaint or defense, as it is to grant summary judgment when there is a genuine issue as to material facts.
As remarked by Judge Sturgis in his dissenting opinion in Gaymon v. Quinn Menhaden Fisheries of Texas, Inc., Fla.App. 1959, 108 So.2d 641, at page 648:
"The summary judgment procedure is an integral part of the judicial system. *229 It affords a valuable aid in securing the `just, speedy and inexpensive termination of every action' as declared by Rule A, F.R.C.P., to be the guiding principle in construing the new rules. A litigant entitled to summary judgment in his behalf enjoys a right no less important than many others secured by law. The decisions have amply safeguarded the right to trial by jury when there is a material issue of fact to be determined and the writer respects and will jealously preserve it. However, the constitutional right of trial by jury is no more important than the constitutional guaranty that justice shall be `administered without sale, denial or delay.' Sec. 4, Dec. of Rights, Const. of Fla., F.S.A.
"Where, as in this state, unlike many others, there is no statutory provision or rule of law requiring plaintiffs to indemnify defendants against unfounded actions, the duty of the court to guard against such actions is increasingly important. All too often damage suits are instituted and prosecuted somewhat in the nature of a coin matching contest in which tails wins for the plaintiff and heads loses for the defendant. Not impugning the bona fides of the plaintiff or her attorney in this cause, the fact remains that the discretion exercised by the trial judge in this instance is the very type that must be exercised in the over-all supervision of trial procedures.
"The right to enjoy the processes of the courts for redress of wrong carries with it definite responsibilities as well. First among these is that there should be a bona fide claim of right, founded in law, and supportable by available evidence."

Already it is felt the trial bench has become improperly but understandably shy in the administration of this rule. Some judges facetiously suggest that in the present climate the one safe course is to grant such judgment only upon stipulation or default, otherwise the reviewing court will somehow with super sensitive second sight glean a disputed issue as a basis for reversal.
When dockets are crowded and outcomes delayed  when demands for judge time exceed the supply  when the costs of maintaining the judicial branch are on the rise  and when the popular dissatisfactions with the administration of justice are considered, it seems to this writer, with deference to those who entertain a contrary view, that our jurisprudence in this area should reflect a pragmatic and realistic approach which would cut through fancy and fiction and which would give fair weight to decisions of the trial court. To do so would, in my judgment, serve to eliminate many of the unworthy, frivolous, and time consuming cases that clog calendars and stand in the way of speedier and more careful attention to meritorious causes. It would serve justice by saving those who now must defend against frivolous and unnecessary law cases from the expense, exposure, and aggravation engendered by such litigation when same are patently without merit.
In sum, I feel that the summary judgment rule is intended to have meaning and that the words "genuine issue" constitute a real and usable criteria to be employed by trial courts in separating the wheat from the chaff.
As earlier mentioned, the plaintiffs could offer no evidence as to the identity of the alleged actors in illegally surveying her and could not explain or add to the affidavits and depositions as to the alleged happenings. In this setting it is profitable to examine Holl v. Talcott, Fla. 1966, 191 So.2d 40, which announced the principle that,
"* * * it must first be determined that the movant has successfully met his burden of proving a negative, i.e. the nonexistence of a genuine issue of material fact. Matarese v. Leesburg Elks Club, supra [Fla.App., 171 So.2d 606]. He must prove this negative conclusively. The proof must be such as to overcome all reasonable inferences which may be drawn in favor of the opposing party. Harvey Building, Inc. v. Haley, supra [Fla., 175 So.2d 780]."
*230 In response to a petition for rehearing the court clarified this by saying that,
"* * * Since the material issues in any cause are those which are relevant to the issues made by the pleadings, it follows that the movant's burden is limited to making the required showing only as to those issues. Therefore the movant may meet his burden by showing conclusively that he is not guilty of the negligence charged against him. Conceivably he may also meet this burden by showing conclusively that the negligence charged, or any committed by him, was not causally related to the plaintiff's injury. He might also do it by showing conclusively that the plaintiff is unable to present requisite proof of negligence charged in the pleadings, as was done in Food Fair Stores, Inc. v. Patty, Fla. 1959, 109 So.2d 5." (Emphasis supplied.)
The Food Fair case, supra, was a "green bean" slip and fall case in which plaintiff,
"* * * by her own deposition stated that there were no witnesses to her injury, that she could offer no evidence as to the length of time the beans had been on the floor, that she could not establish whether the store or some other agency was responsible for the condition of the floor. * * *"
On the basis of her deposition the Supreme Court found the power to grant summary judgment was properly exercised, noting
"While we have consistently urged caution in the exercise of the power to grant summary judgments, we have also taken note of the propriety of exercising the authority in appropriate situations as a means of expediting the disposition of baseless litigation."
Applying this principle, it is seen that since the Tuckers could not establish the identity of persons conducting the alleged illegal surveillance and since they could not explain the purpose behind such alleged acts. either by direct or allowable circumstantial evidence, the trial court properly performed its function by granting summary judgment.
For these reasons I respectfully dissent and cast my ballot in favor of affirmance.
NOTES
[1] We take the same limited view of the issue on appeal as did the District Court of Appeal for the Second District when it previously considered this same case after an earlier summary judgment had been entered in favor of the defendants and appealed to that court, Tucker v. American Employers' Insurance Company, Fla.App. 1965, 171 So.2d 437, 439, 13 A.L.R.3d 1020.