316 So.2d 77 (1975)
Thomas GIALLANZA, Father and Personal Representative of the Estate of Bernadette Giallanza, Deceased, Appellant,
v.
Louis L. SANDS et al., Appellees.
No. 73-1134.
District Court of Appeal of Florida, Fourth District.
July 3, 1975.
Rehearing Denied August 13, 1975.
Thomas E. Hunt, of Mueller & Hunt, Fort Lauderdale, for appellant.
Mark Hicks, of Blackwell, Walker, Gray, Powers, Flick & Hoehl, Miami, for appellee-Vincent J. Strack, M.D.
PER CURIAM.
Upon consideration and review of the record on appeal and the briefs herein we are of the opinion that genuine issues of material fact exist so as to preclude a summary disposition. Holl v. Talcott, Fla. 1966, 191 So.2d 40; Nance v. Ball, Fla.App. 1961, 134 So.2d 35; Lab v. Hall, Fla.App. 1967, 200 So.2d 556. A summary judgment should be cautiously granted in negligence cases and in malpractice suits such as the instant case where genuinely triable issues of fact exist with respect to such matters as whether the appellee Strack was negligent in accepting decedent as a drug abuse patient without actually seeing her; whether the appellee Strack did in fact accept decedent as a patient and assumed the duty to treat; whether the failure to properly diagnose the case was the proximate cause of the death of decedent. The nature of the factual issues as presented precluded a determination at a summary proceeding and necessitated a full *78 exploration by a trial. Lab v. Hall, supra; see also Levy v. Kirk, Fla.App. 1966, 187 So.2d 401.
The sole and only appellate issue presented is whether there exists genuinely triable issues of fact so as to preclude a summary disposition permitting a litigant to have his day in court. The legal issue presented in this appeal is governed by applicable principles of law pertaining to summary judgments; the malpractice insurance controversy, the legislative considerations thereof and newepaper articles thereon are in nowise legally germane to that issue.
The liability of appellee Strack and his conduct under the circumstances are the very factual issues that necessitate resolution at a hearing on the merits. Cf. Sec. 768.13, F.S. As aptly observed, in 30 Fla. Jur., Summary Judgment, sec. 10:
"... Public policy requires that the courts be ever vigilant in making summary disposition of causes, lest the application of the rule result in destruction of the right of litigants to have the issues made by the pleadings tried by a jury of fellow citizens... ."
Therefore, as between a recognition of a litigant's constitutional right to a hearing on genuinely triable issues and a defendant's inconvenience until the issue of liability is resolved the court is constrained to follow the precedent of a jury determination. See Forrest v. Carter, Fla.App. 1975, 308 So.2d 141.
Accordingly, the summary judgment is reversed and the cause remanded for further proceedings consistent herewith.
CROSS and MAGER, JJ., concur.
WALDEN, C.J., dissents, with opinion.
WALDEN, Chief Judge, (dissenting):
It's a sad day for Good Samaritans. Do a simple act of kindness and compassion and end up being sued for it. And what is specially galling, the suit here receives the stamp of judicial approval.
This is a medical malpractice action. The Fourth Amended Complaint alleges that Bernadette Giallanza died as a consequence of malpractice. Her father sued for damages under the wrongful death and survival statute. A large net was cast. In eight separate counts it caught up as defendants three dentists, two hospitals, and four medical doctors. One of the medical doctors was Vincent J. Strack, appellee here.
The trial court correctly assessed the claim against Dr. Strack as having no merit under the criteria found in Rule 1.510(c), F.R.C.P. Summary judgment was entered. The majority of this court's panel has chosen to reverse and cause the matter to go to trial. I would affirm the trial court decision and thereby approve the removal of Dr. Strack from the action.
While nowise denigrating the right of those persons suffering damages to seek recompense via medical malpractice actions, I nowise feel that the mere filing of a complaint absolutely entitles them to a jury trial. Medical malpractice, while receiving a lot of current publicity, is just another form of action which is to be judged by the common everyday rules of law. Such suits enjoy no special status or niche. It is possible for such claims to be frivolous or without merit so as to be subject to summary disposition just as any other claim. When this does happen, as here, it is our duty to discern it and eliminate it.
It is no small matter to refuse to strike down a frivolous claim and thereby cause an innocent defendant to be needlessly subjected to trial. A trial obviously causes expense, damage to professional reputation, time loss, and, necessarily, great emotional strain. Surely the summary judgment rule has some office, some time, some where. See dissent in Tucker v. American Employers *79 Insurance Company, 218 So.2d 221 (4th DCA Fla. 1969), at page 223. It is inappropriate for this court to fault the trial judge's decision and reverse by merely citing some words of plaintiff's charge gleaned from the complaint.
Tedious as it may be, it is necessary to demonstrate the lack of a genuine issue here and Dr. Strack's entitlement to judgment as a matter of law.
The first six counts, plus Count 8, of plaintiff's complaint charge others with the responsibility for the death of decedent from intra-cranial infection, or meningitis. I would say that plaintiff's entitlement to recovery, if any, is to be found in those counts.
The unsworn complaint against Dr. Strack is found in Count 7. While it incorporates by reference all the rest of the complaint, the incorporation adds nothing of significance. It alleges:
"COUNT VII
* * * * * *
"39. The Defendant, VINCENT J. STRACK, MD, for many years last past has been holding himself out to the public as a medical doctor, skilled and able in his profession, and during this time has practiced the profession of a medical doctor at 1140 Bayview Drive, Fort Lauderdale, Florida.
"40. Defendant, VINCENT J. STRACK, MD was negligent in accepting the patient as a drug abuse patient and was negligent in accepting her without seeing her. The Defendant, VINCENT J. STRACK, MD was negligent in that he specifically treated the case as a drug abuse case rather than a case of intra-cranial infection or meningitis. Furthermore, he negligently diagnosed the fever of the patient as coming from the pulmonary area and failed to recognize intra-cranial disease. Specifically, the patient was admitted to BROWARD GENERAL MEDICAL CENTER on May 5, 1971 and was treated for 3 days as a drug abuse case and meningitis was not diagnosed until May 8, 1971. The patient died on May 9, 1971. Had diagnosis of intra-cranial infection or meningitis been made at the time of admission and had the patient been referred to neurology and neurosurgery, medical and surgical procedures could have been instituted which would have prevented patient's death.
"41. That by and through the neglect and carelessness of the Defendant, VINCENT J. STRACK, MD the deceased, BERNADETTE GIALLANZA, was caused to suffer great and excruciating pain and discomfort to her jaw, brain and meninges, and the negligence of the Defendant, VINCENT J. STRACK, MD was a direct and contributing and proximate cause of the decease and expiration of said BERNADETTE GIALLANZA on May 9, 1971. The negligent acts of the Defendant, VINCENT J. STRACK, MD, heretofore set forth were such that they did not conform to the standard of care prevalent in the community for such physicians." (Emphasis added.)
By way of summation and further emphasis, Dr. Strack in the broadest and most general terms (I seriously question if the Count stated a cause of action because of the shortage of ultimate facts supporting the conclusions) was charged with four acts of negligence:
1. "negligent in accepting the patient as a drug abuse patient"
2. "negligent in accepting her without seeing her"
3. "negligent in that he specifically treated the case as a drug abuse case rather than a case of intra-cranial infection or meningitis"
4. "negligently diagnosed the fever of the patient as coming from the pulmonary *80 area and failed to recognize intra-cranial disease."
In granting summary judgment the trial court had before it two depositions only, those of Dr. Strack and Dr. Zeman. There is no conflict in the testimony. The only contradiction to be found in the record is between the above-listed four conclusions of negligence found in the pleading, as opposed to the uncontradicted explicit and sworn testimony found in the depositions. That uncontradicted testimony covers completely and lays to rest the above four pleaded charges of negligence. Most obviously the charges of negligence are false and without support in fact. It is manifest that this defendant never accepted the decedent as a "patient."
The trial court is permitted with the sworn testimony before it to pierce the shield of the pleadings to determine the existence of an issue. It may inquire into the qualitative substance of the complaint and whether it was filed in good or bad faith. Boyer v. Dye, 51 So.2d 727 (Fla. 1951); and A & G Aircraft Service, Inc. v. Drake, 143 So.2d 703 (2d DCA Fla. 1962). It is clearly the law that when the facts established on motion for summary judgment clearly show that there is no genuine issue of any material fact the court may pierce the paper issues made by the pleadings and render judgment on the merits. Parker v. Ferrara, 174 So.2d 574 (2d DCA Fla. 1965); Vihon v. McCormick, 109 So.2d 400 (2d DCA Fla. 1958); Warring v. Winn Dixie Stores, Inc., 105 So.2d 915 (3d DCA Fla. 1958); See, 30 Fla.Jur., Summary Judgment § 13 (1974).
From the uncontradicted sworn testimony of Dr. Strack it appears:
1. He is only on the inactive courtesy staff of Broward General Hospital.
2. On the day the decedent was admitted to Broward General Hospital, May 5th, Dr. Strack was at home. He was ill in bed with a high fever under a physician's care.
3. On May 5th, while Dr. Strack was at home ill, he received a telephone call from a Mrs. Barker. Mrs. Barker is the wife and work assistant of the Director of The Seed, a drug rehabilitation center located four blocks from Broward General Hospital. Dr. Strack was acquainted with Mrs. Barker, and The Seed.
4. Dr. Strack testified that Mrs. Barker stated:
"that she had a young girl who was running a high fever and hallucinating and had been on drugs, or was on drugs, and that they had difficulty in getting her into Broward General Hospital.
* * * * * *
"She said that she had been in contact with the hospital emergency room and they told her that they needed a doctor to assign, a doctor to send her in. They needed a doctor's name for her to be admitted.
* * * * * *
"Q Doctor, did Mrs. Barker give you any more information about Bernadette Giallanza being on drugs or having been on drugs?
"A Well, just that she was on drugs and had taken various drugs, injectable drugs and so forth. And I can't recall the exact words at the time because she said the girl was dying and in a very desperate condition and they were only four blocks away from Broward General. So, I told them to take the girl down there.
"Q Now, the term the girl was dying is sort of an extreme term. Did she explain why she thought the girl was dying?
"A No, except that presumably she had been taking drugs and so forth and so on.

*81 * * * * * *
"Q Now, Doctor, after this conversation with Mrs. Barker, what did you do?
"A I told Mrs. Barker to take the girl to Broward General Hospital and she could mention my name, as you know, recommending the girl be hospitalized. But I did not offer to attend this girl.
"Q Did you call the hospital yourself?
"A No. sir.
"Q If your name then appears on any of the charts, it is because Mrs. Barker used your name when she took the girl in?
"A Well, I would say ultimately, that is the reason. That is the primary reason."
Dr. Strack testified that later the emergency room doctor at Broward General Hospital telephoned him concerning decedent. Dr. Strack testified:
"I explained the fact that I was in bed sick and unable to make the call. I also explained the fact that I was on the inactive courtesy staff and I could not be responsible for the girl's admission.
* * * * * *
"Q Did the emergency room doctor describe to you what this girl's condition was, what he had seen?
"A Not in any great detail that I recall except that she was running a high fever and apparently hallucinating.
"Q Doctor, could you tell what the purpose of his call was? Why did he call you?
"A He wanted to assign the case to me.
"Q He wanted to know if you were actually going to be active on it?
"A Yes. And I told him I couldn't accept the responsibility of being the active attending for two reasons. First that I was ill and confined to my bed and second that I was on courtesy staff and not eligible to attend this type of case."
That night a staff doctor at Broward General Hospital telephoned Dr. Strack. Dr. Strack's testimony of that conversation:
"Q What did Dr. Pizarro say to you and what did you say to him?
"A He told me that the case had been assigned to me and he wanted to know, you know, what was up and so forth and so on.
So, I explained the same thing I explained to the emergency room doctor, that I was ill and unable to actively attend the child.
"Q All right.
"A And furthermore that I was on courtesy and that whoever was on active attending call should be assigned to the case.
"Q All right, sir. Now, did Dr. Pizarro discuss with you this girl's situation?
"A No. I didn't get into great detail, except that she was very ill and had a high fever and so forth and so on.
* * * * * *
"A He said that they had moved her to intensive care and that they were giving her, you know, resuscitation and so forth and a matter of keeping her respirations going and so on."
The next day, May 6th, Dr. Strack visited the chart room at the hospital and wrote at the proper place the information which Mrs. Barker had furnished to him concerning the decedent and noted from the chart that the case had been posted to General Service on the prior day, May 5th.
At no time did Dr. Strack meet the decedent, examine her, treat her, make a diagnosis *82 of her condition, or have any contact with her or her family. His sole contact with the decedent was through the telephone call received from Mrs. Barker on May 5th. On all occasions he related to all concerned that he was ill, ineligible to accept this kind of case, and had refused all responsibility for it.
We now go to the deposition of Dr. Zeman, the plaintiff's expert witness. Dr. Zeman never met the decedent, but had evaluated the chart and given opinions concerning what had been done by other defendants. He noted that several doctors had attended the decedent but that Dr. Strack never saw her. Dr. Zeman's only valuation of Dr. Strack was as follows:
"Q Doctor, your name has been given by Mr. Hunt and Mr. Giallanza as an expert who is to testify in this case, so let me ask you this: Do you have any intention of testifying with respect to the actions of Dr. Strack in this case?
"A I am not even sure who Dr. Strack is. I would have to go through the chart.
"Q Dr. Strack is the physician whose name appears on the admissions area of the Broward General chart on 5/5/71.
"A My only conclusion of the admission of this patient to the Broward General Hospital from reviewing the chart was that she had a brain abcess when she was admitted or she had intercranial disease and their admitting diagnosis was anti-drug abuse. I have nothing else in that admission.
"Q If it were to be established that on 5/5/71 Dr. Strack, who had never seen Bernadette Giallanza, was in bed ill and that he was a personal friend of some people who ran a drug rehabilitation clinic called The Seed  who called him up and asked him to use his influence to get the girl admitted to the hospital and that he did so and in fact made a telephone call and had her admitted to the hospital, to the hospital service and that he himself was on the courtesy staff and did not have an active service in the hospital, would that have any effect upon your opinion or whether or not you would have an opinion as to whether or not he had practiced medicine properly or improperly?
"A I would have no opinion about something like that.
"Q You wouldn't criticize him in that situation?
"A Yeah. I have no opinion about this at all."
And so to summarize the testimony, it is manifestly clear and undisputed that Dr. Strack never diagnosed, never treated, never sent a bill and was never medically connected with the decedent. Moreover, he repetitively projected at all pertinent times that he was unable and unwilling to accept the responsibility for decedent's medical care. There was no basis for anyone's implying or believing that he had undertaken to treat the decedent as a patient. In other words, there was never a doctor-patient relationship of any kind. The sole connection between Dr. Strack and this case was his response to Mrs. Barker, upon being told by her that the decedent was ill and dying and that she was unable to procure medical care or hospitalization, that Dr. Strack allowed Mrs. Barker to use his name merely in order that the decedent could be admitted into the hospital for emergency treatment by the general staff doctors of that hospital. It was certainly clear to Mrs. Barker who was acting on behalf of the decedent that Dr. Strack's activity was simply limited to the act of allowing Mrs. Barker to mention his name when she returned to Broward General with the sick girl.
In the absence of a doctor-patient relationship there can be no liability on the part of the physician. In Kennedy v. Parrott, *83 243 N.C. 355, 90 S.E.2d 754 (N.C. 1956), the court said:
[W]hen a person consults a physician ... seeking treatment for a physical ailment, real or apparent, and the physician or surgeon agrees to accept him as a patient ... imposes on the physician ... the duty ... to apply his skill in a careful and prudent manner." Id. at 757.
Allowing the use of his name cannot be said to have resulted in a doctor-patient relationship. Dr. Strack agreed to allow his name to be used. He fulfilled his part of the relationship, and therefore owed no further duty.
In McNamara v. Emmons, 36 Cal. App.2d 199, 97 P.2d 503 (4th DCA 1939), the court held:
"The relation of physician and patient is, in its inception, created by contract either express or implied. The contract may be general or ... limited... When general, the physician may undertake the treatment of a patient during the course of an illness wherever the patient may be. A physician is under no obligation to enter into ... a general contract for ... treatment of a patient. He may limit his obligation by undertaking to treat the patient only for a certain ailment or injury at a certain place and at a specified time." Id. at 507.
In Findlay v. Board of Sup'rs of County of Mohave, 71 Ariz. 58, 230 P.2d 526 (1951), the court held:
"`[W]hen the professional services of a physician are accepted by another person for the purpose of medical or surgical treatment, the relation of physician and patient is created. The relation is a consensual one wherein the patient knowingly seeks the assistance of the physician and the physician knowingly accepts him as a patient... .' 41 Am.Jur., Physicians and Surgeons, Sec. 71." (Emphasis supplied.) Id. at 531.
In this case neither the patient nor her representatives sought out Dr. Strack for professional services. There was no consensual relationship  Dr. Strack never saw decedent, never saw the parents and never undertook to examine. Although it is not determinative, it is notable that he never charged for any services. When queried by the hospital, Dr. Strack specifically stated that he did not accept the case; he was not asked by the decedent or any representative to attend to her. Mrs. Barker, who was trying to help decedent, did not ask Dr. Strack to accept decedent as a patient.
In Childers v. Frye, 201 N.C. 42, 158 S.E. 744 (1931), the court held:
"A physician or surgeon is not bound to render professional services to every one who applies, and he may therefore, by notice or special agreement, limit the extent and scope of his employment. Such is the simple law of contract." Id. at 746.
The applicability of this clause to the case at hand goes without saying. See Hurly v. Eddingfield, 156 Ind. 416, 59 N.E. 1058 (1901).
In 57 A.L.R.2d 460, § 25, it is noted:
"It appears to be well settled that a physician who is employed only for a specific occasion or service is under no duty to continue his visits or treatment thereafter, and is consequently not liable for abandonment if he ceases treatment of his patient after performing the specific service."
Dr. Strack was never even employed, and contracted only to have decedent hospitalized.
The note in A.L.R. cites the following as "Particular types of limited employment:
"Physician limiting himself to office practice only. * * *

*84 Surgeon undertaking to operate only. * * *
Physician's services limited to one call only. * * *
Physician called for consultation or assistance only. * * *." Id. at 461-464.
It goes without saying that these limitations involve far more patient contact, with but limited liability, than Dr. Strack ever had with the deceased. From the very inception of the plea to use his name to enable the girl to enter the hospital he limited his service to the use of his name only. The very afternoon of the admittance he stated, due to his own illness and courtesy position at Broward General, that General Service should attend the girl.
A late expression in this area of law is found in Chatman v. Millis, 517 S.W.2d 504 (Ark. 1975). In a malpractice action the trial court held:
"[T]here would have to be a doctor-patient relationship or some similar relationship between the parties, and that the complaint in the instant litigation alleged, and counsel had admitted, that Chatman had never been examined by Millis, and in fact, was not even known to the doctor; accordingly, there could be no action for malpractice." Id. at 505.
The Supreme Court of Arkansas affirmed on the basis of the following principles:
"We do not flatly state that a cause for malpractice must be predicated upon a contractual agreement between a doctor (psychologist) and patient, but we do say that a doctor-patient relationship must exist, i.e., there must be a duty, as a doctor, owed from the practitioner to the patient. Under the allegations before us, Millis made no examination of Chatman; in fact, he did not even know Chatman, and had never seen him.
* * * * * *
"Concisely stated, we simply reiterate that under the facts alleged, appellee owed no duty, as a doctor, to appellant, and this duty must be in existence before appellant can recover because of negligence, constituting malpractice." Id. at 506.
The following citations from treatise volumes are applicable, and further bulwark the inescapable conclusion that law and facts combine to prove Dr. Strack devoid of any duty that would have rendered him liable in these circumstances. Dr. Strack made no contractual bargain to enter a physician-patient relationship:
70 C.J.S. Physicians and Surgeons § 37 (1951):
"§ 37. Contract of Employment
"The relationship between physician and patient arises out of contract, express or implied, general or special, and the rights and liabilities of the parties thereto are governed by the general laws of contract.
"The relationship of physician or surgeon and patient is one arising out of a contract, express or implied... .
"The duty owed to a patient is measured and determined primarily by the contract of employment. The contract may be a general contract, but there is no obligation to enter into such a contract and the physician or surgeon may by special agreement or notice limit the extent and scope of his employment."
61 Am.Jur.2d Physicians, Surgeons, etc., § 96 (1972):
"§ 96 Creation and nature of relation.
"A physician is under no obligation to engage in practice or to accept professional employment, but when the professional services of a physician are accepted by another person for the purposes of medical or surgical treatment, the relation of physician and patient is created. The relation is a consensual one wherein the patient knowingly seeks the assistance *85 of a physician and the physician knowingly accepts him as a patient. The relationship between a physician and patient may result from an express or implied contract, either general or special, and the rights and liabilities of the parties thereto are governed by the general law of contract, although the existence of the relation does not need to rest on any express contract between the physician and the person treated. However, the voluntary acceptance of the physician-patient relationship by the affected parties creates a prima facie presumption of a contractual relationship between them... .
* * * * * *
"The physicians and surgeons of a hospital, public or private, [Dr. Strack was not a physician of the hospital] enter into the relation of physician and patient with every patient brought into the hospital, as soon as he is brought in ... The existence of the relation is a matter of fact depending on the questions whether the patient entrusted himself to the care of the physician and whether the physician accepted the case." (Emphasis added.)
And so without laboring it further, it is clear to this writer that the trial court decision granting summary judgment in favor of Dr. Strack should be affirmed.
The majority decision supporting the plaintiff's claim against Dr. Strack does much to make understandable:
(1) The Legislature's current concern with malpractice litigation;
(2) The high cost of malpractice insurance which necessarily results in higher costs to all patients.
(3) Self-imposed limitations and resignations from the practice by medical doctors, which necessarily results in an increased scarcity of medical service;
(4) The difficulty of many citizens in emergency distress in finding someone to care for them.[1]
It is believed that the foregoing circumstances are matters of everyday knowledge which may be properly noticed.
For the foregoing reasons, I respectfully dissent.
NOTES
[1] While not a matter of this record, nor used as a basis for my decision, I mention an Associated Press article for peripheral interest only. It appeared on page 16A of The Miami Herald of Friday, February 21, 1975, and chronicled this dilemma: A woman gave birth to a child in an ambulance without medical help after 21 doctors over a course of 7 hours refused to accept her as a patient or to authorize her admittance to the hospital. The hospital refused to admit her without doctor authorization.

By way of commentary on the article, obviously all 21 doctors could not be sued for malpractice because they played it safe and totally refused to answer a call for help. What will Dr. Strack and others similarly situated do hereafter when someone in an emergency situation applies to them under other than controlled circumstances?