McCALEB, Justice
(concurring in part and dissenting in part).
I subscribe to the observations made in the prevailing opinion respecting absentee voting and also think it clear that contestant has established the casting of 17 illegal votes in the Third Precinct of the Second Ward. But the majority are mistaken when they state “ * * * we were unanimous in concluding that those votes were, in contemplation of law, fraudulent, * * * ” as I have never agreed that they were necessarily fraudulent.
My view is that the 17 votes are illegal; they may have been fraudulent but the evidence does not reveal who cast them or the circumstances under which they were cast and, consequently, I am unable to say with any degree of certainty that they must be fraudulent. But, as the 17 votes were unquestionably illegal votes, the election should have been set aside and another primary ordered because it is not certain, since O’Hara’s majority was only 9 votes, whether the voting machines express the will of the Democratic electors. In this connection, I believe it apt to answer the statement made by one of defense counsel at the special hearing, called for the purpose of determining whether another primary should be ordered or whether the contestant should be declared the nominee, that the unanimous view of the Court respecting the illegality of the election herein is contrary to its prior pronouncements.
There are numerous election contest cases to be found in the jurisprudence, the last expression of this Court on the subject being Lewis v. Democratic Executive Committee, 232 La. 732, 95 So.2d 292, which, incidentally, is the first case involving an election at which voting machines were used. In that matter, it was reiterated that *95 the Primary Law (R.S. 18:364) accorded to an unsuccessful candidate the right to maintain an election contest only where he claimed that, but for fraud or other irregularities specifically alleged, he would have received a majority of the legal votes cast. But it was further declared that judicial recognition had been given to an alternative not specified by the statute, that “* * * in the event the court finds that the frauds and irregularities alleged and proven are of such a grave nature as to deprive the voters of the free expression of their will, it will annul the Primary and order the holding of another election”.
The petition in the Lewis case was found insufficient to support a cause of action, even though it was charged therein that some 228 non-resident and unqualified persons were permitted to vote at a certain election precinct. This ruling was predicated on plaintiff’s failure to exercise the remedy provided by the Primary Law of purging the registration rolls and it was further observed that he did not allege that any one of his watchers protested to the commissioners the asserted infractions of the law.
The contrary conclusion in the case at bar, as applied to the 17 illegal votes cast in the Third Precinct of the Second Ward, rests on a different basis. Unlike the City of Eunice, the City of New Orleans is governed by the permanent registration law (R.S. 18:231-261) which is mandatory in all parishes containing a municipal corporation of more than 100,000 population. In addition to providing for a permanent registration of voters, the Legislature, in keeping with its policy of insuring honest elections, has prescribed for the use of precinct registers at the polls, R.S. 18:238 declaring, among other things, that:
“No person who applies to vote shall be permitted to do so until he has signed his certificate of registration in the precinct register and until a voting commissioner has signed and dated his certification on the voter’s certificate of registration, * * *
Thus, in this case, where the tabulation of the voting machine from the Third Precinct of the Second Ward reveals a total of 17 votes more than the number of persons’ signatures contained on the precinct register, it is fair to deduce that there were 17 illegal votes cast in the precinct.[1] Under such conditions, it is neither contemplated nor essential that a protest be made by a watcher or representative of the con *97 testant as the purpose of the law is to eliminate the possibility of illegal or fraudulent voting. Accordingly, in instances where the proven illegal votes may well affect the accuracy of the proclaimed result, it becomes the obligation of 'the Court to set aside the election and order another one. This is what I believe should be done in this case.
The majority conclude, however, that, since the five commissioners in the Third Precinct of the Second Ward wore O’Hara badges and since one of these commissioners in charge of the poll list indiscriminately added thereon during the voting hours at least 17 names from the registration roll of persons who did not vote in the election, it is to be presumed that the 17 illegal votes were cast for O’Hara either by one or more of the commissioners or through their connivance. This holding is said to rest on the principle that circumstantial evidence is admissible to prove for whom illegal votes were cast in an election and, where the facts from which the finding is made are clearly established and the inference “is the only one” to be fairly deduced, the court should not hesitate to act on the circumstantial evidence and find therefrom the ultimate fact. See 18 AmJur. “Elections”, Section 309.
The rule relied on is well recognized but I think it has been misapplied as the inference drawn by the majority is not founded upon an established fact but, rather, upon another inference drawn from a proven fact.
In the leading case of United States v. Ross, 1875, 92 U.S. 281, 23 L.Ed. 707, it is said that “Whenever circumstantial evidence is relied on to prove a fact, the circumstances must be proved, and not themselves presumed”. Although this substantially expresses the practically unanimous view of the courts of this country, it has been subjected to criticism by some of the lawbook writers, including Mr. Wigmore. See Wigmore on Evidence, 3rd Ed., Vol. 1, Section 41. However, as pointed out by Judge Lockwood in New York Life Ins. Co. v. McNeely, 1938, 52 Ariz. 181, 79 P.2d 948, 954, the divergence between the textwriters and the courts relates more to the form of the statement of the rule than in its application. He correctly observes that “ * * * when an inference of the probability of the ultimate fact must be drawn from facts whose existence is itself based only on an inference or a chain of inferences, it will be found that the courts have, with very few exceptions, held in substance, although usually not in terms, that all prior links in the chain of inferences must be shown with the same certainty as is required in criminal cases, in order to support a final inference of the probability of the ultimate fact in issue”.
Accordingly, in practical application, the rule in civil cases as to circumstantial evi *99 dence, when the inference drawn for the ultimate fact is founded only oil another inference, is no different from that obtaining in criminal cases, which is, as stated in Article 438 of our Code of Criminal Procedure (R.S. 15:438), that “* * * assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence”.
Employment of this rule in the case at bar does not, in my opinion, justify the conclusion that the only reasonable inference to be drawn from the evidence is that the commissioners either voted the 17 illegal votes for O’Hara or that those votes were cast for him through their connivance. Indeed, the only fact established by direct evidence is that 17 more votes were cast in the machine than shown by the signatures on the precinct register kept at the poll and there is no evidence, either direct or circumstantial, tending to establish by whom these votes were cast.
Two hypotheses, equally reasonable, flow from the proof — (1) that the commissioner in charge of the precinct register, either knowingly or negligently, permitted 17 persons to vote without signing the register, or (2) that this commissioner, or some or all of the commissioners acting in concert, fraudulently cast 17 votes in the machines. In the case of the former, the votes would not necessarily be fraudulent votes for, if the commissioner, either negligently or knowingly, permitted 17 qualified voters of the precinct to cast their votes in the machine without signing the precinct register, the votes might be illegal, because the formality of the law was not complied with, but not fraudulent inasmuch as the voter was qualified to vote in the precinct. Surely, no inference is justifiable under this hypothesis that the votes were cast for OTIara.
If, on the other hand, the commissioner, either negligently or knowingly, permitted unqualified persons to vote in the precinct, the votes would be fraudulent but here again it would not be reasonable to assume that they were cast for O’Hara in the absence of proof that the persons casting them were acting in concert with, and at the direction of, the commissioners.
Of course, if the commissioners, acting either in concert or individually, cast the 17 illegal votes in the machines, then it might be reasonable to infer that they cast their votes for O’Hara, whom they represented at the polls.[2] But, before such an inference may be drawn, the circumstantial evidence must be such as to make the con *101 elusion inescapable that the commissioners cast these votes or that they were cast through their connivance.
This is the point at which the reasonable hypothesis rule respecting circumstantial evidence comes into play, for — unless the circumstances are such as to exclude every reasonable hypothesis other than that the commissioners fraudulently cast these votes or conspired to have them cast, the further inference that they were cast for O’Hara cannot logically be drawn. The fact that one of the commissioners, who kept the poll list, wrote down indiscriminately during the voting hours the names of 17 'persons who were registered in the precinct in order to make the poll list tally with the votes cast on the machines is, I must concede, a suspicious circumstance. Yet it is not enough, in my opinion, to exclude all other hypotheses or to give substantial certainty to the conclusion reached by the majority that contestant is the nominee because the 17 illegal votes must have been cast for O’Hara.
I therefore respectfully dissent from the ruling that the contestant has proven that he received a majority of the legal votes cast in the election and is, therefore, entitled to the Democratic nomination.

. I am aware that this deduction of illegality would be questionable, if it were shown that the voters who actually cast the votes without signing the precinct register, were otherwise qualified electors of the precinct!' In such instance, it might be forcibly argued that the qualified voter may not be deprived of suffrage by the dereliction of the precinct commissioner in failing to comply, either knowingly or negligently, with the provisions of R.S. 18:238.

. Even under such conditions, the inference drawn would not necessarily reflect certainty and, hence, the Court should hesitate to resolve the issue for the electors. Albeit, experience in human affairs prompts caution — for it is not always realistic to believe that the mere wearing of a badge of support exhibits the truth. The badge may well be employed to cloak it.