479 P.2d 439

**John Lewis LARSON and Pacific Motor Trucking Company, a California corporation, Appellants,**

v.

**Antonio L. MACIAS and Catherine Macias, his wife, Appellees.**

**I CA–CIV 1241.**

Court of Appeals of Arizona, Division 1, Department A.

Jan. 18, 1971.

Rehearing Denied Feb. 18, 1971.

Review Denied March 16, 1971.

Evans, Kitchel & Jenckes, by Robert R. Mills, Phoenix, for appellants.

Hughes, Hughes & Conlan, by John C. Hughes, Phoenix, for appellees.

STEVENS, Presiding Judge.

Antonio L. Macias, herein referred to as the plaintiff or as Macias, was seriously injured on 20 May 1965 when a rock went through the windshield of the pickup truck he was driving. At the time, Macias was driving in a northerly direction on south 24th Street in the City of Phoenix. The accident occurred in midafternoon. The day was clear. The road was paved.

The rock went through the Macias windshield in point of time when equipment owned by Pacific Motor Trucking Company, herein referred to as PMT, was proceeding in a southerly direction on 24th

Street and was approaching or was approximately opposite the pickup. The PMT equipment was driven by John Lewis Larson, herein referred to as Larson. Both drivers were on their respective sides of the street.

Macias sued PMT and Larson, who are collectively referred to herein as the defendants. No independent negligence on the part of PMT was alleged or attempted to be proven. PMT's liability, if any, rests entirely upon the Larson conduct, he then and there being in the course and scope of his employment.

The case was tried to a jury, which returned a verdict in favor of Macias against both defendants in the sum of $215,000, ten jurors concurring. A judgment was entered on the verdict. Appropriate defendants' motions were made before the verdict and after the judgment. The motions were resolved against the defendants and this appeal followed.

Larson was driving an International truck-tractor which was pulling an empty semi-trailer. The combined overall length of the PMT equipment was approximately 55 feet. The International was a three-axle vehicle. The front axle had single wheels. Each of the two rear axles had dual wheels. The trailer had two axles in the rear and each axle was equipped with dual wheels, a feature which is not vital to the issues. The front of the trailer rested on a fifth-wheel plate, often referred to as a fifth wheel. The fifth wheel is located to the rear of the cab of the International and above the dual rear axles. There is some conflict in the evidence as to whether the bed of the trailer was slightly narrower or slightly wider than the exterior distance measured from the outside of the International's dual wheels. In either event the sides of the trailer bed extended over and beyond the space between the dual wheels. The forward portion of the bed of the trailer was forward of the rear axle of the International.

The rock was smooth and rounded, that is, it had no sharp edges. It was somewhat egg-shaped, although it had a flat side. The rock was approximately six and one-half inches in its largest dimension and approximately three and one-half inches thick at the point of greatest thickness. Larson estimated that the rock weighed from 8 to 10 pounds. The rock was weighed in the office of the Clerk of this Court and it weighed 8¾ pounds. The rock broke a fairly clean hole through the windshield, hit the plaintiff's right hand, bent the pickup's steering wheel, hit the plaintiff in the area of his right eye and forehead, and caused damage to the interior of the cab of the pickup.

It is difficult to set forth a reconstruction of the circumstances of the accident. Many of the details escaped the observation of the witnesses. We will attempt to set forth a reconstruction based upon the testimony and the exhibits. 24th Street was of sufficient width that vehicles traveling in opposite directions could meet and remain a comfortable distance from the white center line. We do not know the relative distances of the vehicles from the center line at the crucial moment in question. We assume that they were traveling approximately parallel to each other. From an examination of the photographs of the tires and the measuring devices shown in the photographs and considering the testimony, it appears that the left-rear-dual tires of the International were approximately 40 inches high. The minimum distance between the dual tires was approximately 1¼ inches.

According to the plaintiff's testimony the lowest point of the hood of the pickup was 40 inches and the high point of the hood was 47 inches. A photograph of the pickup discloses a mark on the hood near the left front and that the point where the rock passed through the windshield was the extreme lower edge of the windshield. The metal retainer surrounding the windshield was dented. Our best estimate as to the direction of the trajectory of the rock is that it was traveling between 20° and 30° east of south, assuming the white

center line runs a true north and south direction. Thus, if the rock was thrown by the left-rear duals of the International, the general direction of the rock corresponded with the general direction that the International was traveling, deviating slightly to the east of the course of travel of the International.

The posted speed limit was 40 miles per hour and the evidence indicates that both vehicles were traveling well under the posted speed.

The issues before this Court relate to liability and to error. The amount of the judgment is not attacked. We refrain from discussing the extensive injuries which Macias sustained and the effect thereof on his personality, his home life and his capacity to follow his trade as a plasterer.

## LIABILITY

The defendants urged in their motions for a directed verdict and in their motion for judgment notwithstanding the verdict that there was an absence of proof of facts upon which liability could be based. They urge in this Court that this cause be reversed with directions to enter judgment in favor of the defendants. We reviewed the record in the light most favorable to sustaining the judgment.

The plaintiff's pretrial statement contains the following declaration:

"It is the position of the plaintiff that the defendant drove over the rock catching the same between the tractor-trailer's dual wheels and hurling it into the plaintiffs (sic) vehicle."

The pretrial order was dated 4 September 1968 and it recited:

"It is alleged that the defendant Larson drive (sic) his vehicle over a large rock which was on the road and that the dual wheels caught up the rock and propelled it through the windshield of the truck being driven by the plaintiff, striking him in the head and injuring him. Plaintiffs allege that the defendant Larson

was negligent in failing to see the rock on the roadway and in failing to control his motor vehicle so as to avoid running over the rock."

The evidence established that the PMT equipment had been at a loading dock and that the area surrounding the loading dock was not paved. Larson drove the equipment from the loading dock onto the paved city streets and traveled on paved city streets for approximately 2 miles before reaching the location which is critical to this opinion. Larson testified that a passenger car was proceeding ahead of him in a southerly direction on 24th Street at approximately the time of the incident in question. There was contrary testimony. Larson did not see the offending rock in the roadway nor did any other witness. Larson was aware that something had happened when he heard a loud noise. He then looked in his rear view mirror and observed the Macias vehicle proceeding northerly and then to its right off the road where it stopped. Macias had no recollection of the events immediately prior to his being injured.

The above-quoted portions of the pretrial statement and the pretrial order well express the only plausible theory of the accident. There was evidence that the rock had rubber marks upon it. There was photographic evidence of scuff marks between the left-rear duals of the International. The plaintiff presented expert opinions that the scuff marks indicated an "in and out" situation, that is, that whatever object had caused the scuff marks had been wedged between the duals a very brief period of time before it was expelled. The scuff marks were characterized as being "fresh," that is, very recent. They were clean with no accumulation of dust or dirt. No witness actually saw the rock leave the dual wheels of the International and pursue a course which resulted in the Macias injuries. One witness saw the rock in the air and saw it strike the plaintiff's pickup.

There was testimony to the effect that the rock in question as it lay in the roadway could not become wedged between the duals but that it could become wedged between the duals if it had been tipped on edge by tires forward from the left-rear duals.

Photographs were introduced into evidence disclosing that a rock of similar size could be seen by the driver of the vehicle on 24th Street, the photographs having been taken at distances of 75 yards, 50 yards and 25 yards.

As the first witness, the plaintiff called Larson for cross-examination as an adverse party. Larson testified that as a part of his training as a driver he was instructed to avoid rocks and that to hit them could be "very dangerous." His testimony proceeded as follows:

"Q. And why is it very dangerous?

"A. It could be throwed (sic) any direction in that manner, as far as that goes.

"Q. It could be thrown any direction, isn't that the right answer?

"A. Yes, sir.

"Q. And it can be thrown with great force, isn't that correct?

"A. Yes, sir.

*   *   *   *   *   *

"Q. If it is picked up by the duals, then it is thrown anywhere, isn't it?

"A. Anywhere, yes, sir.

*   *   *   *   *   *

"Q. And then, when it picks it up, if it comes loose from the tire in here, then the rock has a tendency to go out to the back, doesn't it?

"A. Yes, sir.

"Q. And if it comes loose up here, then it throws it forward, doesn't it?

"A. Yes, sir."

There was evidence that similar scuff marks could have been caused by driving over a stake or driving over railroad tracks in the vicinity of the loading dock area. There was no evidence that either of these events had occurred. As before stated the scuff marks were both fresh and clean. These possible causes did not refute the inescapable conclusion that the scuff marks were created at the approximate time of the tragic event.

Two Phoenix police officers investigated the accident. Sergeant Jack Howe testified as to conversations with Larson at the scene. We quote portions of Howe's testimony.

"Q. Now, at the time that you had the conversation with Mr. Larson, was anything said about the cause of the accident?

*   *   *   *   *   *

"A. Yes.

*   *   *   *   *   *

"Q. Now, sir, what was said in regards to the cause of the accident by the defendant Mr. Larson?

*   *   *   *   *   *

"A. * * * Mr. Larson told us that he was passing the vehicle, the pickup truck being driven by Mr. Macias, and he observed or heard this loud crash or bang. He immediately looked into the rear view mirror and observed the vehicle driving in an erratic manner, which he continued to watch for a short time. He assumed that he had possibly thrown a rock up into the vehicle, at which time he pulled over to the curb and stopped and returned, and walked back to the scene. * *."

## INFERENCES

The defendants strenuously urge that the only proof is a series of inferences and as such there is insufficient proof to support a finding of liability.

Arizona's leading case on this proposition is the case of New York Life Ins. Co. v. McNeely, 52 Ariz. 181, 79 P.2d 948 (1938). In the New York Life case the Arizona Supreme Court stated:

"* * * the courts do not mean that under no circumstances may an inference be drawn from an inference, but rather that the prior inferences must

be established to the exclusion of any other reasonable theory rather than merely by a probability, in order that the last inference of the *probability* of the ultimate fact may be based thereon.

\* \* \* \* \* \*

" \* \* \* while it is permissible to draw successive inferences, each inference, except the last one, in order to be used as a link in a chain of inferences, must be established to the exclusion of any other reasonable theory, rather than merely by a probability." (Emphasis Theirs) 52 Ariz. at pp. 196, 197, 79 P.2d at p. 955.

These statements have been followed in Buzard v. Griffin, 89 Ariz. 42, 358 P.2d 155 (1960); Ray v. Bush, 89 Ariz. 177, 359 P.2d 764 (1961); Avechuco v. Awtrey, 106 Ariz. 44, 470 P.2d 451 (1970); and Gipson v. E. D. Babbitt Motor Company, 13 Ariz. App. 502, 478 P.2d 117 (Filed 23 December 1970).[1]

█ In our opinion the evidence in the case at bar is such that each of the successive inferences was established "to the exclusion of any other reasonable theory than merely by a probability."

1. In the New York Life opinion at a point earlier in the opinion than that point from which the above quotations were taken, our Supreme Court stated:

"In criminal cases, they demand that when a conviction is to be based on a chain of inferences, each and every link in that chain must exclude every other reasonable hypothesis.

\* \* \* \*

"But when an inference of the probability of the ultimate fact must be drawn from facts whose existence is itself based only on an inference or a chain of inferences, it will be found that the courts have, with very few exceptions, held in substance, although usually not in terms, that all prior links in the chain of inferences must be shown with the same certainty as is required in criminal cases, in order to support a final inference of the probability of the ultimate fact in issue." 52 Ariz. at pp. 195, 196, 79 P.2d 954, 955.

This honored rule in criminal cases was restated in State v. Reynolds, 104 Ariz. 149, 449 P.2d 614 (1969):

"The jury was instructed that the law makes no distinction between circumstantial and direct evidence as to the degree of proof required for a conviction. The instruction is contrary to the law of this state. We are committed to the rule that to warrant a conviction it is necessary that the circumstantial evidence offered should not only be consistent with guilt but inconsistent with every reasonable hypothesis of innocence." 104 Ariz. at p. 150, 449 P.2d at p. 615.

The above quotation is found in the case of State v. Harvill, 106 Ariz. 386,

476 P.2d 841 (Decided 16 November 1970). In Harvill the Arizona Supreme Court expressly overruled a long line of Arizona cases which held in conformity with the above quotation. The Supreme Court went on to hold:

"It is the opinion of this court that the probative value of direct and circumstantial evidence are intrinsically similar; therefore, there is no logically sound reason for drawing a distinction as to the weight to be assigned each. We expressly overrule that portion of State v. Reynolds, supra, and any other decision of this court which is contra to our holding in the instant case. We are aware that as a result of this holding it is no longer necessary to instruct the jury regarding the 'reasonable hypothesis' theory of circumstantial evidence where the jury is properly instructed as to 'reasonable doubt.'

\* \* \* \* \*

"It is necessary, therefore, for us to expressly overrule the many decisions of this court which have held that it is fundamental error for the trial court to fail to instruct on the probative force of circumstantial evidence if the prosecution must rely exclusively thereon for a conviction." 476 P.2d at 846.

We express no opinion as to the effect of Harvill upon the rule relative to successive inferences set forth in the New York Life case and followed in succeeding cases. We adhere to the New York Life rule in our analysis of the case at bar.

The negligence of Larson was a negligence of omission, that is, he failed to see the rock in the roadway rather than a negligence of commission, that is, that he actually saw the rock and negligently failed to avoid it. Under these circumstances and in the light of Larson's testimony hereinbefore quoted, we fail to see the applicability of the doctrine of foreseeability in relation to a determination of the tort liability of the defendants.

The defendants strongly urge that the decision of the West Virginia Supreme Court of Appeals in the case of Miller v. Bolyard, 142 W.Va. 580, 97 S.E.2d 58 (1957), requires a reversal of the case at bar. While there are numerous similarities in the West Virginia case, we do not deem the same to be controlling.

We hold that it was not error to deny the motions for a directed verdict and that it was not error to deny the motion for judgment notwithstanding the verdict.

By the foregoing holding we have not favorably considered the contentions of the defendants that this cause must be reversed with instructions to enter judgment in favor of the defendants and to deny a recovery to the plaintiff.

We are next faced with the assertion that there were errors which require that this cause be reversed for a new trial.

## DEPOSITIONS OF WITNESSES

The accident occurred on 20 May 1965 and the civil complaint seeking recovery was filed on 28 March 1967. The defendants engaged in extensive interrogatories, including interrogatories relative to the nature of the injuries sustained by the plaintiff and the witnesses which the plaintiff desired to call. On 30 November 1967 the plaintiff answered interrogatory number seven as to the nature of his injuries. The answer was silent as to any psychological or neurological impairment. The answer to interrogatory number eight listed the plaintiff's expert witnesses and contained no reference to the witnesses who are the subject of this portion of the opinion. Follow-up interrogatories were served by the defendants on 15 January 1969 calling for an updating of the prior answers. The record is silent as to a response on behalf of the plaintiff.

In the meantime and on 4 October 1968 the cause had been set for trial for 3 February 1969.

On 28 January 1969 the defendants moved for a later trial date. The motion recited:

"Plaintiffs have just informed defendants of a new and additional medical aspect of plaintiffs' claim, and of new and previously undisclosed medical evidence and expert witness, namely a psychologist. This constitutes the first notice or indication to defendants that plaintiffs' claim of injury involved any psychological factors or that any person in that field of expertise was to be employed at the trial."

The motion was granted and the case was eventually set for the final trial date of 5 May. On 30 April, pursuant to a defendants' motion, the court ordered that the reports of Kyle K. Pierce, Ph.D., a consulting psychologist, and Warren Gorman, M.D., who is Board certified in both neurology and psychiatry, be delivered to the defendants. The depositions of these two specialists were noticed for 1 May. The reports of the specialists were delivered to counsel for the defendants at the beginning of the respective depositions.

We have before us the deposition of Dr. Gorman, and Dr. Gorman's report of his examination of the plaintiff is attached as an exhibit to the deposition. We do not have the deposition of Dr. Pierce, nor do we have a copy of the report of Dr. Pierce. On advice of Mr. Hughes

representing the plaintiff, Dr. Gorman stated at the deposition that he would refuse to state his "medical opinions or conclusions or the bases for such opinions or conclusions during this deposition unless" he was "paid a fee of $250." He stated that he would limit his deposition evidence to "factual material, other than opinions." We are informed, and the plaintiff does not contest the fact, that upon Mr. Hughes' advice Dr. Pierce refused to testify as to professional conclusions or opinions absent payment of a professional fee of $150. The record discloses that the defendants offered to pay le.ser figures to both of these experts.

May 1st was a Thursday. The trial started the following Monday. For reasons not contested, the defendants were unable to bring the matter of the depositions to the attention of the trial court until 5 May, the morning of the trial. At that time there was a motion to compel answers to the depositions citing Rule 37 of the Rules of Civil Procedure, 16 A.R.S., and a motion for a default judgment for the failure to answer the interrogatories citing Rule 37 (d) of the Civil Rules and Foster v. Brooks, 7 Ariz.App. 320, 438 P.2d 952 (1968). These motions were denied.

Timely objections were made to permitting these experts to testify and the objections were overruled.

■ The foregoing delay in marshalling essential expert testimony and the late advice with reference thereto by the plaintiff to the defendants and the failure to update interrogatories in the face of a timely request are not approved by this Court. On the other hand, we find an absence of an adequate showing that the defendants were in fact actually prejudiced by reason of these events and the resulting limitations imposed upon their discovery rights. The evidence in question related to the issue of damages and this issue is not before us on this appeal. Under these circumstances, we decline to

pass upon the right of a professional expert for one party to decline to express his professional opinion in the absence of the payment of a fee which he or the attorney specifies.

## INSPECTION BEFORE LEAVING LOADING DOCK

Sergeant Howe, one of the investigating officers, testified that Larson stated that the dual tires could have picked up the rock in the dock loading area. Such an event would not have been consistent with the express statements as to the plaintiff's theory of liability, which statements are set forth in the pretrial statement and in the pretrial order entered by the court. The officer's statement was received over objection by the defendants. Over the objections of the defendants, Larson was examined as to the statement attributed to him by the officer and as to the inspection of the tires upon the leaving of the loading area.

■ From an examination of the entire record, we find the error to have been harmless. The main thrust of the evidence and the arguments of counsel to the jury, which were reported, limited the jury's consideration to the propositions and theories set forth in the pretrial statement and the pretrial order.

## MOTOR CARRIER'S SAFETY REGULATIONS

■ Donald L. Asa was called as a witness for the plaintiff. He owns and operates a diesel driver training school. He testified that in his instructional program he uses the Motor Carrier's Safety Regulations, regulations relating to drivers in interstate commerce.

Larson testified that his driving was purely intrastate. On direct examination he identified a belt buckle which he was wearing as "an award they give out for three years safe driving," an award he

**570**

received one year prior to the trial. On cross-examination he testified that he was familiar with the manual. Several of the defendants' objections addressed to questions relating to the content of the manual were sustained. The court had announced that it would not permit continuing objections. Two or three questions relating to the manual were asked and answered without objections by the defense. It is urged that the use of the manual was error. The absence of objections cures the claimed errors.

## INSTRUCTIONS

Without a detailed analysis, it is our opinion that the instructions fairly presented the rules of law to guide the jury.

## CONCLUSIONS

Our overall examination of the record leads us to the conclusion that no reversible error was committed.

The judgment is affirmed.

DONOFRIO and JACOBSON, JJ., concur.