[Civil No. 3957. Filed June 6, 1938.]

[79 Pac. (2d) 948.]

# NEW YORK LIFE INSURANCE COMPANY, a Corporation, Appellant, v. LILLIAN McNEELY, Appellee.

Messrs. Ellinwood & Ross and Mr. Joseph S. Jenckes, Jr., for Appellant.

Messrs. Favour & Baker and Mr. A. M. Crawford, for Appellee.

LOCKWOOD, J.—This is an appeal by New York Life Insurance Company, a corporation, hereinafter called defendant, from a judgment on an insurance policy issued by it on the life of Howard B. McNeely, and in favor of Lillian McNeely, hereinafter called plaintiff. There is singularly little dispute in the actual facts shown by the evidence, the real question being as to the permissible inferences to be drawn therefrom. These facts, so far as material to a decision, may be stated as follows:

On August 8, 1930, defendant issued to Howard B. McNeely a policy of life insurance, in the amount of three thousand dollars, payable upon receipt of due proof of death, and three thousand dollars, in addition, payable upon due proof that the death resulted from accident as defined under the provisions of the policy relating to such double indemnity. These provisions, so far as material to the case, read as follows:

"The Double Indemnity provided on the first page hereof shall be payable upon receipt of due proof that the death of the Insured resulted directly and independently of all other causes from bodily injury effected solely through external, violent and accidental

means and occurred within ninety days after such injury.

''Double Indemnity shall not be payable if the Insured's death resulted from self-destruction, whether sane or insane; from the taking of poison or inhaling of gas, whether voluntary or otherwise; from committing an assault or felony; from war or any act incident thereto; from engaging in riot or insurrection; from participation as a passenger or otherwise in aviation or aeronautics; or, directly or indirectly, from infirmity of mind or body, from illness or disease, or from any bacterial infection other than bacterial infection occurring in consequence of accidental and external bodily injury. . . . ''

On Friday, April 19, 1935, McNeely's wife, now Mrs. Geneva Damant, met him in the afternoon at their home in Prescott, and about ten or fifteen minutes later he left in his automobile. About 10 or 11 o'clock that night he telephoned to her, and was neither seen nor heard from again during his lifetime. On the morning of Saturday, April 20th, his automobile was found on the Prescott-Phoenix highway, about two miles south of Congress Junction, and about one hundred yards north of the Sunrise Service Station. This highway runs in a general north and south direction, and a culvert crosses under the road at the point where the car was found. At each end of said culvert is a concrete abutment which extends about six inches above the highway grade. The car was headed in a northeasterly direction, partially resting on or against the abutment on the east side of the highway, the left front wheel hanging over the concrete abutment. This wheel and the front axle were bent, and a fender somewhat damaged. No glass was broken nor were there any marks of collision; the steering wheel was not damaged, and there was no evidence of any injury on the inside of the car. On the next morning the body of insured was discovered about two hundred fifteen feet from the highway where the car was found. Decompo-

sition had commenced, discoloration was setting in, and flies and maggots were already at work. There was no evidence of any bruise, bump, contusion or abrasion on the head or other part of the body, except a slight discoloration near his right ear and on the back of his right hand. There were bubbles of froth or blood of some kind coming from his lips, and a little dried blood on his face that had apparently come from the right ear. In the pocket of his clothing were found two letters and a will, in his own handwriting. These documents were offered in evidence by defendant, but were excluded by the court, and we shall refer to them later in this opinion. An inquest was thereafter held and a death certificate filed by the coroner, which stated among other things:

"The principal cause of death and related causes of importance were as follows: Automobile accident.

. . . . . . . . . . . . . .

"Manner of Injury—back of head."

McNeely's body was taken to Prescott and embalmed, and later an autopsy was performed thereon at the request of his wife and mother. This autopsy showed that the whole body was greatly dehydrated, so far as the outside tissues were concerned; there was no sign on the head of any contusion or injury, no bleeding from the mouth, nose nor ears that would indicate a fracture of the skull, and no depression on the skull such as might have resulted from a severe blow over the bones of the head. The bones of the neck and vertebrae were intact, and there was no indication of any contusion or severe injury of the chest or other parts of the body. All of the abdominal organs were apparently normal, with the exception that the lateral half of the stomach was definitely charred and darkened, and the tissues gave the appearance of having been cauterized. Proof of death was duly

made, and defendant admitted liability on the ordinary life policy and paid the amount due under that to plaintiff, which was accepted by her, defendant disclaiming liability for double indemnity. The case was tried to a jury which rendered a verdict in favor of plaintiff, and from the verdict this appeal was taken.

There are a number of assignments of error, but we think it necessary to discuss only two at length, which are that the court erred in refusing to admit the letters and will, and that the evidence is not sufficient to show that the insured met his death under circumstances covered by the double indemnity provisions of the policy.

It will be seen by referring to the double indemnity provision above set forth, that it was payable only on proof that the death of the insured resulted directly and independently of all other causes from bodily injury effected solely by external, violent and accidental means. Under a provision of this kind, it is necessary not only that the beneficiary of the policy prove the death of the insured, but also prove affirmatively, by a preponderance of the evidence, that such insured came to his death by reason of the specific causes set forth in the policy, and from those causes only. *Radius* v. *Travelers Ins. Co.,* (9 Cir.) 87 Fed. (2d) 412; *Washington Nat. Ins. Co.* v. *Chavez,* (Tex. Civ. App.) 106 S. W. (2d) 751. Plaintiff, recognizing this rule, set forth in her complaint:

"That on or about April 20th, 1935, the insured, Howard B. McNeely, without design on his part received, in an automobile collision through external, violent and accidental means, bodily injuries of an internal and not definitely ascertainable nature, which killed him and from which he died within a few hours."

Defendant admitted the execution of the policy, and that plaintiff was the beneficiary thereunder; that proof of death of the insured had been sent to it, and

that it had paid to the plaintiff a certain sum which was admittedly due on the ordinary life features of the policy, and then denied generally all of the other allegations of the complaint. It also set up three affirmative defenses, which we need not specify. The case came to trial and the plaintiff offered certain evidence and then rested. Defendant then offered evidence which tended to show affirmatively that the death of insured was due to suicide, and not to an automobile accident, as contended by plaintiff. Among other things in support of this theory, it offered to prove his condition at the last time that he was seen, various remarks which he made to his wife then, and particularly offered the two letters and the will which were found upon his person. These documents read as follows:

"Defendant's Exhibit D.

(Envelope)

"The Harmon Audit Company,
"Accountants and Auditors,
"Bashford Building,
"Prescott, Arizona.

"Mrs. Geneva McNeely

"To be opened personally.

(Letter)

"Dear Geneva:

"I have loved you dearly, and I hope, tho' do not expect that you have felt the same toward me. Consequently, and not in the very far future I suspect that you will marry again and be happy. If it were you, I know I could not, however, knowing how you feel (that is, all is a playhouse and such) you will probably not miss me in the least. I hope, however, against hope that your future children have not sandy hair and pigeon toes. Green Eyes I wish for, but do not expect.

"With the greatest of love and all happiness.
"HOWARD.

"As well as you may, and as well as you can, please, for any affection you hold for me, look after Mother.
 "Your little baby HOWIE."

 "Defendant's Exhibit E.

 (Envelope)
"The Harmon Audit Company,
"Accountants and Auditors,
"Bashford Building,
"Prescott, Arizona.

 "Mrs. Lillian McNeely
"To be opened personally.

 (Letter)
"Dear Mother:
 "Please, for my memory and in all you hold dear, look after my darling. You realize that beside you she is all I have really cared for. Forgive me in this and seek to find happiness. This is certainly the hardest, if the shortest way out. I love you both.
 "HOWARD.
"Please look after Dad."

 "Defendant's Exhibit F.

 (Envelope)
"The Harmon Audit Company,
"Accountants and Auditors,
"Bashford Building,
"Prescott, Arizona.

 "Last Will

 (Will)
"The last will and testament of Howard Brian Mc-
 Neely.
 "To my father I bequeath the sum of $1, and the fervent hope that he become and remain sober.
 "To my Mother, Mrs. Lillian McNeely, I bequeath all my earthly possessions free of direct liens and encumbrances. With the further stipulation that she pay the other monetary bequests of this will.
 "To my wife, Geneva McNeely, I bequeath my best wishes for a happy future and the sum of one dollar, to make it legal.
 "HOWARD B. McNEELY.

"To my creators I fervently wish that they forgive me their debts even as I forgive my debtors.

"McN."

All these offers were rejected by the court, and defendant was not permitted to read the letters to the jury, on the theory apparently that suicide is an affirmative defense which must be pleaded in order that evidence thereof may be admitted. We are convinced that this ruling of the court was erroneous. It is true that many courts and works on insurance law have stated generally that in an action on an insurance policy death from an excepted cause should be pleaded by the defense. 14 R. C. L., p. 1235, and cases cited. This is undoubtedly the rule with a policy where the payment is due when the insured dies from *any* cause *except certain specified ones set up in the policy*. If, as in many instances is the case, the policy is in the ordinary form, promising payment on proof of death, but providing there is no liability if the death is caused by suicide, the plaintiff need prove only the death of the insured to make a *prima facie* case, and if the insurer contends that the death was caused by suicide, it must plead and prove such defense in order to free the company from liability. *Home Benefit Assn.* v. *Sargent,* 142 U. S. 691, 12 Sup. Ct. 332, 35 L. Ed. 1160. But when, as in the double indemnity features of the present policy, the company only insures against death from a *certain specified cause,* it is obvious that the complaint must allege not merely that the insured is dead, as in the case of a complaint on an ordinary life policy, but must set up that he died of the specified cause set forth in the policy of insurance, and must prove that allegation. In such a case a general denial puts in issue the cause of death, and defendant, under such denial, may offer evidence showing any cause of death other than that set up by the complaint. The difference between the two classes

of cases is well set forth in the case of *Jefferson Standard Life Ins. Co.* v. *Clemmer,* (4 Cir.) 79 Fed. (2d) 724, 103 A. L. R. 171, in the following language (page 731):

"The differences that have arisen as to which party bears the burden of persuasion in insurance cases, when the defense is based on suicide, have been caused in part by a failure to distinguish between cases in which the plaintiff sues on an accident insurance policy or the double indemnity clause of a life insurance policy, and cases in which the insurer in a life policy raises the defense of suicide. If death from any cause except suicide is insured against, the burden is on the company to prove the exception; but if death from one specific cause, such as accident, is insured against, the burden is on the policy-holder to show that the condition precedent to liability has taken place. [Citing cases.]"

In the case of *Travelers' Ins. Co.* v. *Wilkes,* (5 Cir.) 76 Fed. (2d) 701, the lower court took the position taken by the trial court in this case, that the burden of showing suicide in an action on an accident policy was on the defendant insurer, as with an ordinary life policy, and the appellate court, in reversing the judgment, said (page 705):

" . . . At the same time, more than once and against requested charges to the contrary and over exceptions taken, the jury were told that the defense of suicide was an affirmative defense and the burden of establishing it by a preponderance of the evidence was upon the defendant. The latter charge would be correct in a suit upon the usual life policy containing an exception of death by suicide, for then the plaintiff need prove only death; the insurer having to plead and prove the exception. But this policy promises payment not for death, but for death by accident. Suicide, at least when sane, is not accidental death. A plaintiff under this policy has the burden of proving an accidental death, thereby negativing suicide. The denial that the death was accidental was a sufficient plea.

The additional plea that it was suicide, though more specific, really added no defensive merit. It was not the setting up of an exception from the policy but a denial that the death was of the sort insured against. The burden of proof remained on the plaintiff. [Citing cases.]"

The same situation arose in the case of *Federal Life Ins. Co.* v. *Wilkes,* (Tex. Civ. App.) 218 S. W. 591, and therein we find the following language (page 594):

" . . . It is the contention of appellee that accidental death in its very nature excludes the idea and element of suicide. We are inclined to agree with the appellee, if the death was intentional, it was not accidental. Self-destruction, inflicted purposely, is not classed as an accident. When, therefore, the appellant admitted that the deceased came to his death by an accident within the meaning of the policy, it admitted liability under the policy. We think under the second count, seeking double indemnity, that the burden was on the plaintiff to allege and prove that the deceased came to his death by accident within the terms of the policy. *The defendant could have met, under a general denial, such issue with evidence that the death was purposely self-inflicted,* and, if established, would have defeated recovery upon the double indemnity feature." (Italics ours.)

There are many other cases to the same effect but we think it unnecessary to cite them. We are of the opinion that where an insurance policy insures only against death from a specified cause, and the complaint alleges that the insured came to his death from that cause, the insurer may, under a general denial, offer any evidence which reasonably tends to show that the cause of death was other than that set forth in the policy. The trial court, therefore, erred in refusing to admit in evidence the letters and will above referred to if they reasonably tend to show that insured committed suicide. We think there can be no question that they are almost conclusive of this fact. No rea-

sonable man, reading the letters and knowing the circumstances under which they were found, could come to any other conclusion than that it was the intention of the insured, at the time he wrote those documents, to take his own life. It was, therefore, prejudicial error to exclude them from the consideration of the jury. This would require a reversal of the case and its being remanded for a new trial without the necessity of discussing the other assignments of error, but we deem it best to dispose of some of them for the guidance of the trial court if the case is tried again.

■■ As we said above, it is incumbent upon the plaintiff not only to plead, but to prove, that the insured came to his death by "bodily injury effected solely through external, violent and accidental means." Is there sufficient evidence in the record to sustain a verdict to that effect? No one saw him die, and there is no direct evidence as to the cause of death. Any conclusion as to such cause must be based upon circumstantial evidence. It is the contention of defendant in this case that while circumstantial evidence is admissible to prove the ultimate fact of death from "bodily injury effected solely through external, violent and accidental means," that the circumstances shown by the evidence were not sufficient to justify such a conclusion on the part of the jury, for the reason that in order to draw the ultimate inference of accidental death, it was necessary to pile inference upon inference, and presumption upon presumption, and that this may not be done under the law. The proof of an ultimate fact may be made in two manners, the one by direct or, as it is sometimes called, testimonial evidence, and the other by indirect or, as it is frequently denominated, circumstantial evidence. But it is the rule of law that while a conclusion as to an ultimate fact may be based upon an inference from circumstantial evidence, in reaching such conclusion

the inference as to the ultimate fact may not be based on an inference as to the existence of the circumstantial facts.

This rule has been stated in the case of *United States* v. *Ross,* 92 U. S. 281, 23 L. Ed. 707, in the following language (page 283):

" . . . They are not legitimate inferences, even to establish a fact; much less are they presumptions of law. They are inferences from inferences; presumptions resting on the basis of another presumption. Such a mode of arriving at a conclusion of fact is generally, if not universally, inadmissible. No inference of fact or of law is reliable drawn from premises which are uncertain. Whenever circumstantial evidence is relied upon to prove a fact, the circumstances must be proved, and not themselves presumed, Starkie on Ev. p. 80, lays down the rule thus: 'In the first place, as the very foundation of indirect evidence is the establishment of one or more facts from which the inference is sought to be made, the law requires that the latter should be established by direct evidence, as if they were the very facts in issue.' It is upon this principle that courts are daily called upon to exclude evidence as too remote for the consideration of the jury. The law requires an open, visible connection between the principal and evidentiary facts and the deductions from them, and does not permit a decision to be made on remote inferences. Best on Evid. 95,"

and the same rule has been repeatedly declared by innumerable decisions. *Manning* v. *John Hancock Mut. L. Ins. Co.,* 100 U. S. 693, 25 L. Ed. 761; *Atchison, T. & S. F. R. Co.* v. *De Sedillo,* 8 Cir., 219 Fed. 686; *Siemer* v. *Chesapeake & O. R. Co.,* 180 Ky. 111, 201 S. W. 469; *Sutton's Admr.* v. *Louisville & N. R. Co.,* 168 Ky. 81, 181 S. W. 938; *People* v. *Razezicz,* 206 N. Y. 249, 99 N. E. 557; *State* v. *Kelly,* 77 Conn. 266, 58 Atl. 705; *Globe Accident Ins. Co.* v. *Gerisch,* 163 Ill. 625, 45 N. E. 563, 54 Am. St. Rep. 486; *Binns* v. *State,* 66 Ind. 428; *Philips* v. *Travelers' Ins. Co.,* 288 Mo. 175,

231 S. W. 947; *State* v. *Lem Woon,* 57 Or. 482, 107 Pac. 974, 112 Pac. 427; *Taylor* v. *General Acc. Assur. Corp.,* 208 Pa. 439, 57 Atl. 830; *East Tennessee & W. N. C. R. Co.* v. *Lindamood,* 111 Tenn. 457, 78 S. W. 99; *Fadden* v. *McKinney,* 87 Vt. 316, 89 Atl. 351; *Wilkie* v. *Chehalis County Logging & Timber Co.,* 55 Wash. 324, 104 Pac. 616. In fact, the dissent from the rule, so far as the reported cases are concerned, is rare indeed. *Hinshaw* v. *State,* 147 Ind. 334, 47 N. E. 157, 158; *State* v. *Fiore,* 85 N. J. L. 311, 88 Atl. 1039. And yet some of the most prominent text writers on the law of evidence attack the rule most vigorously as being unsound in logic and unsustained by practical consideration. 1 Wigmore on Evidence, paragraph 41. As was said by Dean Wigmore:

" . . . There is no such rule; nor can be. If there were, hardly a single trial could be adequately prosecuted. For example, on a charge of murder, the defendant's gun is found discharged; from this we infer that he discharged it; and from this we infer that it was his bullet which struck and killed the deceased. Or, the defendant is shown to have been sharpening a knife; from this we argue that he had a design to use it upon the deceased; and from this we argue that the fatal stab was the result of this design. In these and innumerable daily instances we build up inference upon inference, and yet no Court ever thought of forbidding it. All departments of reasoning, all scientific work, every day's life and every day's trials, proceed upon such data."

What is the cause of this sharp divergence between the text writers on the one hand, and the courts on the other? After a careful examination of both the cases and the texts, we are of the opinion that the divergence is more in the form of stating the rule than the application thereof. As Dean Wigmore has frequently pointed out in his monumental work, the rules of evidence applied by the courts are not,

and never have been, governed strictly by the principles of logic as taught and applied in the schools. These principles are frequently modified or even set aside on account of practical reasons, which experience shows should govern the trial of controverted issues in the courts. It is true, of course, that in everyday life, all men frequently act as the result of the repeated piling of inferences upon inferences, and, as a matter of strict logic, if an inference has any probative value whatever in aiding one to determine the ultimate question of fact, it should be considered. The principle which is applied by the average man in his own private affairs usually is that no matter how many inferences are piled on each other, it is only necessary that each successive inference should be more probable than any other which might be drawn under all the circumstances. The courts, however, have always insisted that the life, liberty and property of a citizen should not be taken away on possibilities, conjectures, or even, generally speaking, a bare probability. In criminal cases, they demand that when a conviction is to be based on a chain of inferences, each and every link in that chain must exclude every other reasonable hypothesis. In civil cases, involving only property rights, the rule is not so strict, and it is sufficient, if the ultimate fact is to be determined by an inference from facts which are established by direct evidence, that it be more probable than any other inference which could be drawn from the facts thus proven. But when an inference on the probability of the ultimate fact must be drawn from facts whose existence is itself based only on an inference or a chain of inferences, it will be found that the courts have, with very few exceptions, held in substance, although usually not in terms, that all prior links in the chain of inferences must be shown with the same certainty as is required in criminal cases, in order to support a final inference

of the probability of the ultimate fact in issue. We think that this is the true meaning of the "inference upon inference" rule in civil cases as borne out by a careful analysis of the majority of cases in which it has been applied, and that the courts do not mean that under no circumstances may an inference be drawn from an inference, but rather that the prior inferences must be established to the exclusion of any other reasonable theory rather than merely by a probability, in order that the last inference of the *probability* of the ultimate fact may be based thereon. This rule is not based on an application of the exact rules of logic, but upon the pragmatic principle that a certain *quantum* of proof is arbitrarily required when the courts are asked to take away life, liberty or property.

Let us apply the rule to the facts of the given case. We have the following facts shown by direct evidence: An automobile belonging to the insured was found which had run off the road in such a manner that the left front wheel and the front axle were bent, and a fender damaged. No other injury to the car appeared, and it evidently had not upset. Between twenty-four and forty-eight hours after the car had been thus injured, the body of the insured was found some two hundred feet away from the automobile. It was already advancing in decomposition and showed a discoloration, some of which was on the back of the head and the hand, and some blood and froth were observed exuding from the nose and mouth at the time the body was discovered, while flies and maggots were at work. There were no marks of any kind of bodily injury, or violent death, and the letters above referred to were found on his body. How could reasonable men, on this evidence, have reached the ultimate conclusion that insured met his death by "bodily injury effected solely through external, violent and accidental means"? The only imaginable theory of any cause of

death which would bring it within the terms of the policy, was that death was the result of physical injury received in some form of an automobile accident. To reach this conclusion it must have been inferred first that the insured was riding in his car at the time it was injured; second, that he did not voluntarily drive the car into the culvert in an attempt to commit suicide, but did so accidentally; third, that he was violently thrown against some part of the car or thrown from it by reason of the accident; fourth, that by reason thereof he sustained a bodily injury; and fifth, that such bodily injury, independent of all other causes, resulted in his death. As we have pointed out previously, while it is permissible to draw successive inferences, each inference, except the last one, in order to be used as a link in a chain of inferences, must be established to the exclusion of any other reasonable theory, rather than merely by a probability. Let us apply this test. We think the inference that the deceased was riding in the car at the time of the accident comes within the rule. It was his car, in which he left Prescott late the preceding day, and his body was found within a few hundred feet of it. It, therefore, may be used as an inference upon which to base the next inference. This was that he did not voluntarily drive the car into the culvert. In order to draw the third inference that he was thrown violently against some part of the car, or else upon the ground, it is necessary that the second inference must come within the rule. If it does not, the chain breaks. We think this second inference does not satisfy the rule so that a third may be based thereon, in view of the undisputed evidence in regard to the letters found upon his person. It is true these letters were not admitted in evidence, but they should have been, and since they must be at a new trial, we shall consider them in determining whether there is evidence in the record

sufficient to sustain a verdict in favor of plaintiff. Judging from those letters, it would appear to any reasonable man that it is as probable that he damaged his car in an attempt to commit suicide as that he did it accidentally.

But even assuming that the inference that he did not voluntarily drive the car into the culvert is established with sufficient certainty to form the second link of the chain, we think the third inference that he was thrown violently against some part of the car or the ground is not permissible under the rule. There is nothing except speculation upon which this inference can be based, for no broken bones were found, no bruises or contusions upon any part of his body, no shattered glass nor broken steering wheel, nor anything which would show to a reasonable certainty that he came violently into contact with any portion of the car or the ground near there. It is true that if this were the ultimate inference to be drawn, it would not be necessary that it be shown with the certainty to which we have previously referred, but it is not. The fourth link in the chain is the inference that he sustained some bodily injury by reason of being thrown against the car or the ground, and this inference may not be drawn unless the inference of his being thrown against the car or the ground is established with the certainty required by the rule, or else there is some direct evidence of a bodily injury. The only direct evidence tending to show bodily injury is a general discoloration of the skin and bloody froth oozing from the ear, mouth and nose. In view of the time the insured had been dead, and the general condition of the body, it is at least as probable that these things were due to the presence of the flies and maggots, and the natural result of decomposition, as that it was the result of a bodily injury effected by external and violent means. But even assuming that the inference of bodily

injury effected by violent means were permissible, it is not the ultimate one necessary to sustain plaintiff's case. There must be a further inference that the bodily injury, independently of all other causes, caused his death. It will thus be seen that, in order to reach the ultimate conclusion necessary to sustain the verdict, there must be at least five links in the chain of inferences; that only the first may be considered to be established by a reasonable certainty; that the second, at best, is but a probability, and that the third, fourth and fifth are not even probabilities, but merely possibilities.

But, it may be said, in addition to all of the evidence which we have discussed, the certificate of the coroner is sufficient, even standing alone, to justify the jury in its verdict. Plaintiff offered as evidence, as a part of her case in chief, a certified copy of the certificate of the coroner, made under section 2730, Revised Code 1928. This section reads as follows:

*"Death occurring without medical attendance.* If death occur without medical attendance, the undertaker shall notify the local registrar of such death, who shall, prior to the issuance of a permit, notify the local health officer and refer the case to him for immediate investigation and certification. When the local health officer is not a physician, or when there is no such official, the local registrar may make the certificate and return from the statements of persons having knowledge of the facts; if, however, the local registrar believes that the death may have been due to an unlawful act or to neglect, he shall refer the case to the coroner for investigation and certification. The coroner shall state in such certificate the name of the disease causing death, or if from external causes, the means of death; and whether appearing accidental, suicidal, or homicidal; and such information as may be required by the state registrar.''

The certificate contained certain information required by section 2729, Revised Code of 1928, which

we need not discuss, and, in addition, the following language:

"The principal cause of death and related causes of importance were as follows:
"Automobile accident.
" . . .
"If death was due to external causes (violence) fill in also the following:
"Accident, suicide or homicide? —— Date of injury. 4–20–35.
"Where did injury occur? Congress Junction.
"Specify whether injury occurred in industry, in home or in public place. Public ranch.
"Manner of injury. Back of head."

It was contended by plaintiff, and her contention was sustained by the trial judge, that this portion of the certificate complied with section 2730, *supra,* and that this was sufficient to make a *prima facia* case of accidental death, under the provisions of section 2740, Revised Code of 1928, which reads, in part, as follows:

*"Certified copies by state registrar.* The state registrar shall, upon request, supply to any applicant a certified copy of the record of any birth or death, for the making and certification of which he shall charge a fee of fifty cents. Any such copy of the record of a birth or death, when properly certified by the registrar, shall be *prima facie* evidence of the facts therein stated."

In the case of *California State Life Ins. Co.* v. *Fuqua,* 40 Ariz. 148, 10 Pac. (2d) 958, the admissibility of a coroner's certificate and its effect, was discussed by us, and we said as follows (pp. 162, 163):

"There is no doubt that the Legislature may, if it desires, change the rules of evidence. The statute in question expressly directs the coroner to state whether the death appears accidental, suicidal, or homicidal. Unless this opinion of the coroner's jury is to be considered as a 'fact' and used in evidence, it is absurd for the Legislature to require it to be inserted in the

certificate, for it would be purposeless. We therefore hold that the clause in regard to how the gunshot wound was inflicted should have been admitted in evidence with the rest of the certificate, as *prima facie* evidence not merely that the death was caused by a gunshot wound, but as to why and how the wound was inflicted. *Jensen* v. *Continental Ins. Co., supra.* [3 Cir.], [28 Fed. (2d) 545].

''But while it was error for the court to refuse to admit the coroner's certificate of death, we think the case should not be reversed for that reason. All of the witnesses who could have given any testimony supporting the conclusion reached by the coroner's jury testified fully in the trial of the case at bar. The death certificate merely stated the opinion of the coroner's jury based on the testimony of those witnesses. The trial jury having before it the same evidence, and perhaps some which was not available at the inquest, came to a different conclusion. Since the death certificate was merely *prima facie* and not conclusive evidence as to the cause of death, the jury herein had the right to take a different view on that point from the evidence presented to it, and the certificate could not reasonably be expected to have changed the result.''

 It is contended by plaintiff that this is a holding, in effect, that the verdict of the coroner's jury is sufficient to make a *prima facie* case of death by reason of an automobile accident, and that even though there is evidence in the case from which the jury might reach the conclusion that the death was due to some other cause, it raises an issue of fact for consideration. The verdict of the coroner's jury, like that of a trial jury, must be based upon evidence, and that evidence is subject to the same rules in regard to its sufficiency to sustain the one verdict as it is in regard to the other. In the absence of any showing as to what the evidence was upon which the coroner's jury reached its conclusion, we think there is the same presumption that the evidence was sufficient to sustain the verdict that there is when the verdict of a trial jury is before

us without the evidence upon which it was based, and that under such circumstances, even though there was other evidence justifying a conclusion contrary to that reached by the coroner's jury, there is such a conflict in the evidence as makes it an issue of fact for the trial jury as to whether they will accept the verdict of the coroner's jury that the death was due to accidental means, or reach the conclusion justified from the other evidence submitted to them, that it was due to some other cause.

But when the trial jury has before it the same evidence that the coroner's jury did, and when it appears, as a matter of law, that such evidence would not sustain a verdict of the trial jury that death was caused by accidental means, we think it would be a violation of every principle of justice to hold that merely because the verdict of the coroner's jury was made *prima facie* evidence of a fact, it remains such when it is shown conclusively that it was based upon evidence which would not justify the conclusion which it reached. If, therefore, it appears at the new trial that the coroner's jury, when it returned its verdict of accidental death, had before it only evidence which, under the rule laid down herein, would not have justified the trial jury in returning a verdict of that nature, we think that the verdict of the coroner's jury raises no such issue of fact as to the cause of death for submission to the trial jury.

There are a number of other questions raised by the assignments of error, but we think it unnecessary to discuss them, although we have considered them.

The judgment of the superior court of Yavapai county is reversed and the case remanded for a new trial in accordance with the principles set forth herein.

McALISTER, C. J., and ROSS, J., concur.