860 P.2d 1306

William LOHSE, Robert Richardson and Marianne Richardson, husband and wife, John Cassels, Jean Harvey, Barry Miller and Paula Miller, husband and wife, David Smith and Barbara Smith, his wife, Ardis C. Cassels, and Omer Winfield P. O'Neill, Plaintiffs–Appellants,

v.

Eddie L. FAULTNER and Dolores Faultner, husband and wife, Southwest Forest Industries, Inc., a corporation, Defendants–Appellees.

No. 1 CA–CV 89–476.

Court of Appeals of Arizona, Division 1, Department C.

Dec. 29, 1992.

Reconsideration Denied Feb. 5, 1993.

Review Denied Nov. 4, 1993.

James P. Cunningham, P.C. by James P. Cunningham, Phoenix, for plaintiffs-appellants.

Aspey, Watkins & Diesel by Donald H. Bayles, Jr., Mark C. Brachtl, Flagstaff, for defendants-appellees Faultner.

Mangum, Wall, Stoops & Warden by Robert W. Warden, Charles H. Apt III, Flagstaff, for defendants-appellees Southwest Forest.

## OPINION

FIDEL, Chief Judge.

This case arises from a forest fire that originated in the Kaibab National Forest and spread to adjoining land. Plaintiffs are neighboring landowners whose property was damaged or destroyed by the fire. Plaintiffs seek damages, claiming that defendants negligently failed to conduct a fire patrol after logging in the forest and thereby permitted an otherwise detectable and suppressible fire to spread out of control.

On appeal, we affirm summary judgment for defendants because plaintiffs have failed to present evidence that defendants' nonfeasance deprived them of a substantial chance to escape harm. On cross-appeal, we remand the issue of attorneys' fees for the trial court to consider in its discretion pursuant to Ariz.Rev.Stat.Ann. ("A.R.S.") § 12–341.01(A).

## FACTS

We state the facts in the manner most favorable to the party opposing summary judgment. *Rogers v. Retrum,* 170 Ariz. 399, 400, 825 P.2d 20, 21 (App.1991).

### A. The Contracts

In 1957, defendant Southwest Forest Industries contracted with the United States Forest Service for the exclusive right to cut pulpwood in parts of the Colorado Plateau, including parts of the Kaibab National Forest. Southwest later subcontracted some of its logging to defendant Eddie Faultner. Faultner's activities in the Kaibab Forest on June 14, 1984, are the subject of this case.

In Southwest's "Colorado Plateau Pulpwood Sales Contract" with the Forest Service, Southwest committed itself and its subcontractors to certain fire prevention and suppression responsibilities:

Section 9b. Fire Suppression.

1. During the period of this contract, the purchaser [Southwest] shall, both independently and in cooperation with the Forest Service, take all reasonable and practicable action to prevent and suppress forest fires on the sale area and vicinity. The purchaser shall require his employees, subcontractors and their employees, respectively, to do likewise.

2. Independent initial fire suppression action by the purchaser on such fires shall be immediate and shall include the use of all necessary manpower and equipment at his disposal, including his subcontractors and their employees and equipment, engaged on or within 5 miles of the sale area in construction or in logging, removing or processing timber.

\* \* \* \* \* \*

Section 9e. Fire Precautions.

1. The purchaser shall comply with, and shall require his employees, subcontractors, and their employees, engaged in the performance of any part of this contract to comply with, the fire precautionary measures set forth herein. . . .

The contract also required Southwest to join with Forest Service administrators in the execution of periodic fire plans. The 1984 fire plan for Southwest's Kaibab operation made it "the responsibility of the Purchaser, its employees and contractors, to do all in their power to contain all fires occurring in the operating areas."

Southwest's subcontract with Faultner incorporated by reference the terms of its contract with the Forest Service. The subcontract also required Faultner to "comply

with all Federal and State laws and regulations applicable to [his] operations."

### B. The C Regulations and Fire Patrols

The parties dispute whether one particular federal regulation applied to Faultner's operations on the date of the fire.

In 1975 the Forest Service adopted safety regulations known as "C Regulations," one of which defined the obligation of a timber plan "purchaser" such as Southwest to conduct fire patrols on days when fire danger is high:

> To prevent, detect, and suppress fire, Purchaser shall provide a trained fire guard at each operating area where power-driven equipment has been operated during the day. The fire guards shall constantly perform their duties during operating hours and for three (3) hours after the woodswork stops for the day, when the Fire Precaution Plan is Plan B, C, or D.[1]

The Forest Service defined the application of the C Regulations broadly: "For use in all contracts." The C Regulations were incorporated into fire plans for Southwest operations in the Tonto, Apache–Sitgreaves, and Coconino forests. The Kaibab Forest administrator, however, did not expressly incorporate the C Regulations into the 1984 fire plan for Southwest's Kaibab operations under the Colorado Plateau Pulpwood Sales Contract. Without reference to the extensive fire patrol requirements of the C Regulations, the Kaibab fire plan merely provided as to fire patrols: "Patrols in the cutting areas during the periods of fire emergency ... will be conducted by the Purchaser when requested in writing by the Timber Sale Administrator [a Forest Service representative] or his alternate."

Despite this omission, Eddie Faultner knew of the C Regulations and their requirements and knew he was supposed to patrol for fire for two to three hours after shutdown on days when fire danger was high.

### C. The Fire

On the morning of June 14, 1984, Faultner and his crew were cutting timber in the Kaibab Forest. The forest was dry, the wind was high, and at approximately 11:30 a.m., the Forest Service declared a "red flag alert"—a declaration of extreme fire danger requiring logging operations to shut down.

Around noon, P.J. Pearson, the Kaibab timber sale administrator, a Forest Service employee, arrived at Faultner's cutting site to advise him of the red flag alert. Faultner, on lunch break, had already stopped and parked his loader between two four-foot piles of old wood cuttings and debris. These "slash" piles, fifteen to twenty feet from the loader, were not of Faultner's making, but were highly combustible in dry conditions. Pearson touched the radiator of the loader and found it warm, not hot.

---

1. Regulation CT7.21 in its entirety provides:

   *Fire Guards.* (11/75) Purchaser shall designate at least one representative to train and supervise each woodsworking group of men in fire prevention, detection, and suppression. Each such representative shall be named in the fire plan.

   To prevent, detect, and suppress fire, Purchaser shall provide a trained fire guard at each operating area where power-driven equipment has been operated during the day. The fire guards shall constantly perform their duties during operating hours and for three (3) hours after the woodswork stops for the day, when the Fire Precaution Plan is Plan B, C, or D (CT7.22).

   Fire guard service on one operating area shall satisfy the requirements on adjacent areas if the travel time with available transportation is not in excess of ten (10) minutes to any of the other areas requiring such service.

   Each fire guard shall be physically able, vigilant, and trained to prevent, detect, and report any fires and to promptly and efficiently take suppression action with available required firefighting equipment and men on any fire that starts on Sale Area. Each fire guard shall be equipped with a vehicle and a fire tool cache consisting of a cache box, 2 four-to-five gallon backpack pumps filled with water, 2 size 0 shovels, 2 Pulaskis, and 2 McLeod tools maintained in serviceable condition.

Pearson talked with Faultner for about twenty minutes, part of the time in the vicinity of the loader. Before leaving, he gave permission for Faultner's wood stackers to continue working, stating "this would give us a few eyes in the woods." Faultner left shortly after Pearson. He did not instruct the stackers to conduct a fire patrol. Nor had he ever shown them how to do so.

When Pearson and Faultner left, the stackers—a father and two brothers—were eating at their pickup some distance from the loader. When they finished, one of the brothers, returning to his work site, saw a cloud of dust or smoke. On closer investigation, he saw flames going higher than the trees, and he and his family left the scene.

At 12:59 p.m., the fire was spotted from a Forest Service lookout tower. By 1:10 p.m., when a Forest Service helicopter crew flew over the scene, the fire covered five acres and was spreading rapidly. The fire burned for two or three days, ultimately covering 1268 acres, of which 102 were private lands.

Melvin Douglas, the Forest Service agent assigned to investigate the fire, concluded that it probably originated in the slash pile on the exhaust side of the loader. Douglas stated that a spark might have smoldered in the slash for as much as thirty minutes before igniting into flame. Although the loader exhaust was equipped with a spark arrestor that exceeded applicable requirements, no spark arrestor is 100% effective; however, carbon particle testing did not trace the fire to the exhaust. Nor did Douglas, at his deposition, identify the exhaust or any other agent as the probable source. Although Douglas stated that the fire was probably attributable to activities of Faultner's crew, he had not ruled out independent sources, among them the exhaust of Forest Service agent Pearson's pickup.

**2.** The court also granted partial summary judgment rejecting plaintiffs' theory that defendants

## TRIAL COURT PROCEEDINGS

In a first round of motions for summary judgment, the trial court ruled that plaintiffs could not rely on *res ipsa loquitur* to establish that Faultner caused the fire.[2] The plaintiffs have not appealed that ruling. This appeal arises from a second round of motions for summary judgment that focused on Faultner's failure to conduct a fire patrol. Defendants argued for summary judgment on two grounds: (1) that plaintiffs could not prove that the absence of a fire patrol had caused their loss; and (2) that defendants had complied with their contractual obligations to the Forest Service and were accordingly immunized by the federal "government contractor's defense" from any liability arising from their failure to conduct a fire patrol. The trial court granted summary judgment on both grounds. It also denied defendants attorneys' fees, stating, "this action did not arise out of contract." Plaintiffs have appealed the grant of summary judgment, and defendants have cross-appealed the denial of attorneys' fees.

## DISCUSSION

### A. Plaintiffs' Claims

Plaintiffs' claims, a mix of contract and tort theories, boiled down to the assertion that defendants neglected their contractual safety responsibilities and failed to conduct their logging operations with reasonable care.

Plaintiffs sought contract damages as third party beneficiaries of Southwest's contract with the Forest Service, claiming to have been injured by Southwest's and Faultner's breach of the nondelegable duty to "take all reasonable and practicable action to prevent and suppress forest fires," including the action of conducting fire patrols.

Plaintiffs sought tort damages, alleging that Faultner negligently caused the fire

were liable for engaging in an ultrahazardous activity.

and, through lack of a fire patrol, negligently permitted it to spread out of control. Plaintiffs argued that Southwest was vicariously liable for Faultner's conduct, despite his independent contractor status, because its fire prevention and suppression duties were nondelegable. Plaintiffs also argued that Southwest was independently liable because it did "practically nothing to see that its subcontractor ... had an appropriate fire prevention and fire control plan, and that he would carry it out, especially on a day of extreme fire danger." Plaintiffs argued that they were within the range of defendants' tort duty of reasonable care because defendants knew of private lands in the vicinity and should have known that neglect of their fire control responsibilities would subject nearby property owners to an unreasonable risk of harm.

In the first round of motions for summary judgment, plaintiffs invoked *res ipsa loquitur* to surmount their inability to pinpoint the cause of the fire or attribute it to a specific act of Faultner's crew. *See, e.g., McDonald v. Smitty's Super Valu, Inc.,* 157 Ariz. 316, 318, 757 P.2d 120, 122 (App. 1988) ("*Res ipsa loquitur* is ... a rule of circumstantial inference of responsibility for an injury."). The trial court held, however, that plaintiffs could not rely upon *res ipsa loquitur* because they could not rule out causal agents independent of Faultner's machinery, crew, or control.

Plaintiffs have not appealed that ruling. Instead, they have shifted focus from cause of the fire to failure to conduct a fire patrol. They argue that a loader next to dry slash piles was so foreseeable a source of danger that its vicinity should have been particularly subject to a fire patrol. Thus, according to plaintiffs, even though the loader has not been isolated as the source of the causal spark, a proper fire patrol would have targeted the danger-potent loader/slash-pile area and detected the fire,

whatever its cause, at a suppressible stage. As plaintiffs state the argument:

> The logical question to ask is "but for" the absence of a fire patrol in the area of the loader to "detect and suppress fire", would this forest fire ha[ve] occurred? The obvious answer is, probably not.

### B. The Duty to Conduct a Fire Patrol

Defendants contest that Faultner was obliged to conduct a fire patrol. The Kaibab fire plan, they argue, required a fire patrol only upon the Forest Service's written request; because that fire plan did not specifically incorporate the C Regulations, and in the absence of a written request, no fire patrol was required.

Building on this argument, defendants further claim immunity under the federal "government contractor's defense," a doctrine that, in circumstances involving "uniquely federal interests," precludes state tort law from imposing a duty of care on a federal contractor that "is precisely contrary to the duty imposed by the Government contract." *Boyle v. United Technologies,* 487 U.S. 500, 509, 108 S.Ct. 2510, 2517, 101 L.Ed.2d 442 (1988).[3]

Plaintiffs dispute the assumption that underlies this argument. They argue that the fire plan did not *restrict* fire patrols to days when written authorization was given by the Forest Service; the fire plan merely established one, not the sole, circumstance in which a fire patrol would be required. A fire patrol was necessary, according to plaintiffs, whether or not requested in writing, on days when failure to patrol would violate the regulatory fire patrol requirement applicable to *all* contracts or would violate the contractual—and tort law—requirement to take reasonable fire prevention and suppression care. Accordingly, the argument continues, to require a fire patrol in this case would not contravene the

---

**3.** In *Boyle,* a design defect suit arising from the crash at sea of a military helicopter, government specifications required the escape hatch to open out. Plaintiffs claimed that it should have been built to open in.

defendants' federal contractual duties, and the federal government contractor's defense does not apply.

Although the trial court accepted "shared governmental immunity" as one of two grounds for summary judgment, we need not resolve the issue. Instead, we assume for disposition purposes that plaintiffs are correct and that defendants, in the exercise of reasonable care, should have conducted a fire patrol on red flag days. Indulging that assumption, we turn to the dispositive issue of causation.

### C. Inference Upon Inference

As its second basis for summary judgment, the trial court stated "inference upon inference." Before we take up the larger subject of causation, we examine the obsolescent inference upon inference rule.

In *New York Life Ins. Co. v. McNeely,* 52 Ariz. 181, 79 P.2d 948 (1938), the Arizona Supreme Court established a differential standard for direct and circumstantial evidence: "[W]hile a conclusion as to an ultimate fact may be based upon an inference from circumstantial evidence, in reaching such conclusion the inference as to the ultimate fact may not be based on an inference as to the existence of the circumstantial facts." *Id.* at 192–93, 79 P.2d at 953. The *McNeely* court observed that in criminal cases, "when a conviction is to be based on a chain of inferences, each and every link in that chain must exclude every other reasonable hypothesis." *Id.* at 195, 79 P.2d at 954. The court concluded that an equally stringent requirement should apply in civil cases. *Id.*

■■■ The inference upon inference rule was based on the assumption that circum-

stantial evidence is intrinsically weaker than testimonial evidence. 1A John Henry Wigmore, *Evidence in Trials at Common Law* § 41 (Peter Tillers rev., 1983); *see McNeely,* 52 Ariz. at 192–96, 79 P.2d at 953–55. It is now well-settled, however, in Arizona and elsewhere, in civil and criminal cases, that direct and circumstantial evidence have equal probative worth. *State v. Harvill,* 106 Ariz. 386, 391, 476 P.2d 841, 846 (1970); *Andrews v. Fry's Food Stores,* 160 Ariz. 93, 96, 770 P.2d 397, 400 (App. 1989); *see also, Holland v. United States,* 348 U.S. 121, 137–38, 75 S.Ct. 127, 136–37, 99 L.Ed. 150 (1954). In *Harvill,* moreover, our supreme court abandoned the rule that each link in a chain of circumstantial inference must exclude every other reasonable hypothesis. 106 Ariz. at 391, 476 P.2d at 846. Not only did the court thus remove the conceptual underpinnings from *McNeely;* it expressly overruled "any other decision" to the contrary, though not listing all by name. *Id.*

In short, the inference upon inference rule has no further validity in Arizona. As stated by Wigmore, "the drawing of inferences from inferences is the natural and inevitable course of things." 1A Wigmore, *supra,* § 41 n. 3, at 1112.

### D. Causation

Despite the terseness of the trial court's ruling, we do not believe the court to have strictly applied the abandoned inference upon inference rule. Rather, in the larger context of the parties' arguments, we understand the court to have assessed the evidence as inadequate to permit a jury finding of cause-in-fact. We turn to what the parties submitted on that issue.[4] The starting point is Douglas's opinion that the

---

4. The pertinent evidence comes from the affidavit and deposition of Wesley E. Lathrop. The affidavit is a part of our record. The deposition, which was never filed with the trial court, is not. The record reflects that on May 1, 1989, the plaintiffs requested leave of the trial court to file all depositions for the trial court's benefit in considering motions for summary judgment. On June 15, 1989, the date of oral argument on

the motions, the court ordered plaintiffs to file the depositions and other supplementary materials by June 23, 1989. Although many depositions were filed on or before June 21, our record and that of the superior court indicate that the Lathrop deposition was not among them. Each of the parties has cited Lathrop deposition segments to this Court that were never cited to

fire started in a slash pile next to Faultner's loader. The question is whether a proper fire patrol would have made a difference.

■ In response to the first round of motions for summary judgment, plaintiffs filed the affidavit of Wesley E. Lathrop, a retired Forest Service fire management officer, criticizing defendants' fire control effort as inadequate to meet the risks on the date of the fire.

> There should have been an active fire patrol of all the areas conducted for a reasonable time which would be consistent with the size of the area worked and to insure that all of the area was inspected before withdrawing from the site.

In a later deposition, Lathrop was questioned at length on whether the absence of a fire patrol made a difference in this case. In the statement of facts supporting their response to defendants' renewed motions for summary judgment, plaintiffs paraphrased his testimony as follows:

> He testified that the failure to conduct an appropriate fire patrol was negligence and that a proper fire patrol would have increased the probability of detecting the fire at such time action could be taken.[5]

Defendants, addressing the same subject, quoted testimony of a different vein:

> Q. You cannot exclude the reasonable possibility that even if there was a fire patrol that you claim should have existed, that that one fire patrolman in one area of the cut would have been unable to put out the fire that started in this area, if it did, because of the distance and, in addition, the size of the fire when it started and how quickly it spread; isn't that true, sir?
>
> A. That's true of every area in the forest and every sale; and well, you can-

not put enough people. You'd have to put a person throughout the area, and the purpose of the patrol at least would minimize the chance of a fire occurring and also suppress the fire should one occur.

> Now, the requirements that the Forest Service has had are not unreasonable. They're trying to at least have a system to reduce the amount of fires that occur during these critical conditions.
>
> Q. Mr. Lathrop, can we agree then, that if what you say is true, you know, if the facts are as you have assumed them to be, that even if there was such a fire patrol, you cannot say that fire patrol would have stopped the fire from happening; isn't that true?
>
> A. That's true of any fire.
>
> \* \* \* \* \* \*
>
> Q. You said one man is what should have been left.
>
> A. For that size area, right. You wouldn't require that every square foot be covered with people. If they had set up previously what they would do, they would hit the highest risk area where equipment had worked. The piece of equipment that was burned up, where power saws operated, that would be the first area.
>
> Q. And again, for the facts of this case, you're unable to say the end result would have been different had that been done?
>
> A. *No, I really—I can't say—well, I don't have any opinion, I guess. If they would have had a specific procedure to follow, they may have gone to that highest risk area where that piece of equipment and people were working. If that were the case, they might have got to it just in that first minute you're*

---

the trial court. We consider only those excerpts made available to the trial court.

**5.** In their brief to this Court, plaintiffs quote underlying testimony that supports the accuracy

of this paraphrase, but neither Lathrop's precise answer nor the question that evoked it was quoted to the trial court.

*talking about. If they had, then they could have caught it. If they went the other way, then they probably wouldn't have. You're speculating. You can speculate both ways.*

Q. So to say that the result would have been any different you just have to speculate?

A. Well, yeah, as to—without a given procedure they were to follow, which they had none, would have to be speculation.

Q. If they had had a specific procedure in the first place and went to the loader—the mule where you think the fire started or Mr. Douglas thinks it started, then he proceeded on up the hill to other places they had been cutting, and when the fire broke out, the result would have been any different so as far as we know—

A. You're speculating. If they checked the most dangerous area first, they may have.

Q. It's possible any amount of patrolling by one man might not have changed the result?

A. That's true of anything.

(emphasis added).

We earlier quoted plaintiffs' formulation of the critical question as one of "but for" causation:

> The logical question to ask is "but for" the absence of a fire patrol in the area of the loader to "detect and suppress fire", would this forest fire ha[ve] occurred?

Yet Lathrop did not define a fire patrol as a fixed guard stationed by the loader. More widely ranging use of power machinery required a more widely ranging patrol, and it was merely speculative, according to Lathrop, whether a proper fire patrol would have been at or near the loader at a detectable and suppressible stage of the fire. Such testimony falls far short of plaintiffs' "but for" mark.

■ Plaintiffs also argue, however, that evidence of the lost "opportunity to take action" suffices to create a jury issue of proximate cause. Although Lathrop declined to state that a proper fire patrol would have *probably* resulted in detection and suppression of the fire, he made the very different point that a proper fire patrol would have *"increased the probability"* of detection and suppression. In effect, he attributed to defendants' neglect the loss of a chance for plaintiffs to escape harm. The case most helpful to plaintiffs on recovery for loss of a chance—*Thompson v. Sun City Community Hosp., Inc.*, 141 Ariz. 597, 688 P.2d 605 (1984)—was actually cited to us by Southwest.

In *Thompson*, our supreme court lowered the threshold of proof to reach a jury on causation in a limited group of cases "where defendant has negligently breached an undertaking to prevent a certain harm." *Id.* at 605–06, 688 P.2d at 613–14. The plaintiff in *Thompson* claimed that her son's injury was enhanced when the defendant, a private hospital, negligently transferred him to the county hospital at a time when he needed emergency care. Plaintiff's experts testified "that there would have been a 'substantially better chance' of full recovery had surgery been performed at once." *Id.* at 607, 688 P.2d at 615. They did not quantify the chance, however, and plaintiff thus offered no evidence of a greater than 50% probability that timely action would have improved the ultimate result.

The supreme court, though reversing on other grounds, ruled that the trial court had correctly "permit[ted] the case to go to the jury on the issue of causation with less definite evidence of probability than the ordinary tort case." *Id.* Although the jury issue remained whether the defendant had *probably* caused or contributed to plaintiff's injury, the plaintiff's evidence sufficed to place that issue in the jury's hands. *Id.* As the court stated the rule,

> [E]ven if the evidence permits only a finding that the defendant's negligence increased the risk of harm or deprived

plaintiff of some significant chance of survival or better recovery, it is left for the jury to decide whether there is a probability that defendant's negligence was a cause in fact of the injury.

*Id.* at 606, 688 P.2d at 614.[6]

Although *Thompson* was a medical malpractice case, the court chose some of its supporting examples from a broader range of torts. *See id.* at 606 n. 8, 688 P.2d at 614 n. 8. Moreover, the court did not purport to limit its rule to malpractice cases, but rather announced a rule for cases in which "the chance interest was within the range of the duty breached by defendant and the harm which followed was the type from which the defendant was to have protected the plaintiff...." *Id.* at 608, 688 P.2d at 616. This case falls within that definition. Yet it differs from *Thompson* in several ways.

In *Thompson*, the defendant hospital had directly undertaken a duty of protection toward plaintiff's son. Here by contrast, plaintiffs had no direct relationship with defendants; rather, plaintiffs were third parties foreseeably within the protective range of defendants' undertaking toward the Forest Service. Although we note this distinction, we assume for the purpose of decision that it is surmountable. In *Thompson*, our supreme court applied Section 323, Restatement (Second) of Torts (1965).[7] This case falls within parallel Section 324A (1965).[8] We need not now decide whether to extend the *Thompson* rule to the third party context of 324A, because we decide the case on other grounds.

A second distinction lies in damages. *Thompson* concerned bodily injury; this case concerns property damage. We assume for the purpose of decision that this distinction is also surmountable. Restatement Sections 323 and 324A both address undertakings for the protection of another's person *or things* and both contemplate liability for *physical* harm, which the Re-

**6.** Some authorities reason that the recovery in a loss-of-a-chance case should be the value of the lost chance. *See* Joseph H. King, Jr., *Causation, Valuation, and Chance in Personal Injury Torts Involving Preexisting Conditions and Future Consequences,* 90 Yale L.J. 1353, 1363–64 (1981) (When it cannot be proven by a preponderance of the evidence that a cancer patient was denied a cure by defendant's negligence, but it can be proven that the patient was deprived of a 30% chance of a cure, recovery should be permitted for the loss of the 30% chance.); *see also Herskovits v. Group Health Coop.,* 99 Wash.2d 609, 664 P.2d 474, 486 (1983) (Pearson, J., concurring) (citing and endorsing King's approach); Jefferson L. Lankford & Douglas A. Blaze, *The Law of Negligence in Arizona* § 4.7, at 58–59 (1992) (commending value of lost chance as realistic measure of damages in legal malpractice cases).

Our supreme court has not yet chosen to take this route. Instead, in *Thompson* the court left the jury free, under a routine probability instruction, to award plaintiffs their full loss. 141 Ariz. at 607–08, 688 P.2d at 615–16 & n. 10. Loss-of-a-chance under *Thompson*, in other words, is not a reduced item of damages but rather an opportunity in a limited class of cases to seek full damages from a jury upon a lesser showing of causation than would be ordinarily required.

**7.** § 323. Negligent Performance of Undertaking to Render Services

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if

(a) his failure to exercise such care increases the risk of such harm, or

(b) the harm is suffered because of the other's reliance upon the undertaking.

**8.** § 324A. Liability to Third Person for Negligent Performance of Undertaking

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if

(a) his failure to exercise reasonable care increases the risk of such harm, or

(b) he has undertaken to perform a duty owed by the other to the third person, or

(c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

statement defines to include "person, land, or chattels." § 323 cmt. d. We leave to be answered in future case law whether Arizona will follow the Restatement so far as to permit loss-of-a-chance recovery for pure property losses; we decide this case on other grounds.

We return to the evidence of lost chance. Although in *Thompson,* the plaintiff's experts were unwilling or unable to quantify the patient's loss of a chance, they did testify that he would have had "a *substantially* better chance" to escape injury, but for the hospital's neglect. 141 Ariz. at 607, 688 P.2d at 615 (emphasis added). Such evidence is lacking here.

We do not read *Thompson* as requiring ritual incantation by expert witnesses of the precise words "substantial chance"; yet neither do we read it as terminating the court's gate-keeper function when any loss of chance is proven, no matter how slight. The *Thompson* court described its rule as appropriate when "defendant's negligence increased the risk of harm or deprived plaintiff of some *significant* chance of survival or better recovery." *Id.* at 606, 688 P.2d at 614 (emphasis added). In a concurring opinion commended in *Thompson* for its careful review of authorities and policy concerns, *id.* at 606–07, 688 P.2d at 614–15, the author concluded that a "plaintiff has established a prima facie issue of proximate cause by producing testimony that defendant probably caused a *substantial* reduction in [the victim's] chance of survival." *Herskovits v. Group Health Coop.,* 664 P.2d at 487 (Pearson, J., concurring). A law review article cited in *Thompson* described the "substantial factor" test as "the only available means of coming to grip with the cause problem" in cases where it cannot be proven to a better than even probability that a negligently omitted protective act would have changed the result. Wex S. Malone, *Ruminations on Cause–In–Fact,* 9 Stan.L.Rev. 60, 95–96 (1956). The *Thompson* opinion also relied on *Hicks v. United States,* 368 F.2d 626 (4th Cir. 1966), which stated its softened probability rule as follows:

When a defendant's negligent action or inaction has effectively terminated a person's chance of survival, it does not lie in the defendant's mouth to raise conjectures as to the measure of the chances that he has put beyond the possibility of realization. If there was *any substantial possibility of survival* and the defendant has destroyed it, he is answerable.

*Id.* at 632 (emphasis added).

Our review of these authorities leads us to conclude that although *Thompson* "soften[ed] the edge of the probabilities formula considerably," Malone, *supra,* 9 Stan. L.Rev. at 94, the proof in qualifying cases still must rise to the level of substantiality. Plaintiffs' evidence does not reach that level in this case.

We acknowledge that a bright line is elusive. Close questions should be left to the jury, not preempted by the court. Yet the contrast with *Thompson* persuades us that the question in this case is not close. There was no speculation in *Thompson* whether agents of the hospital, in the absence of negligence, would have been positioned to prevent harm. Surgeons, through timely intervention, could have discovered the early progression of plaintiff's injuries and taken any measures still available to minimize his further loss. Here, by contrast, it was wholly speculative whether Faultner's agents, in the absence of negligence, would have been positioned to prevent harm. Lathrop testified that one person would have sufficed to patrol the entire area that Faultner had been working. Forest Service agent Pearson and Faultner spent some time in conversation at the loader when the loader engine had been shut down long enough to be warm, not hot, to Pearson's touch. There were other areas where crews used power machinery that needed patroling, and it was purely speculative, according to Lathrop, whether even a diligent patrol would have been near the loader or elsewhere in the woods at the critical moments when the fire could be detected and suppressed.

Plaintiffs dismiss the Lathrop deposition segments offered by defendants as merely cross-examination to be evaluated by a fact-finder, not the judge. Yet defendants provided far more of the substance of Lathrop's testimony than did plaintiffs. Plaintiffs rely wholly on Lathrop's general assertion that a fire patrol would have "increased the probability" of timely detecting the fire. But the range of probability runs from infinitesimal to nearly certain, and probability can increase from one to another insignificant degree. Lathrop ultimately acknowledged that he had no opinion whether a fire patrol would in fact have prevented plaintiffs' injuries in this case. Like the trial court, we find such evidence too thin, even under *Thompson*, to create a jury case of proximate cause.

## THE CROSS–APPEAL

Defendants requested attorneys' fees pursuant to Ariz.Rev.Stat.Ann. section 12–341.01(A) (1992), which permits discretionary fees to the prevailing party in any contested action arising out of a contract, express or implied. The trial court denied fees, stating "this action did not arise out of a contract, so attorneys' fees may not be awarded." We conclude that the trial court erred.

■ Plaintiffs alleged that defendants' culpable acts constituted breach of contract as well as tort. In such cases, fees may be awarded under 12–341.01(A) "as long as the cause of action in tort could not exist *but for* the breach of contract." *Barmat v. John & Jane Doe Partners A–D*, 155 Ariz. 519, 522, 747 P.2d 1218, 1221 (1987) (quoting *Sparks v. Republic Nat'l Life Ins. Co.*, 132 Ariz. 529, 543, 647 P.2d 1127, 1141, *cert. denied*, 459 U.S. 1070, 103 S.Ct. 490, 74 L.Ed.2d 632 (1982)).

Plaintiffs claimed that defendants neglected their contractual safety responsibilities and failed to conduct their logging operations with reasonable care. The contract element of this dual assertion was not essential to plaintiffs' tort claim against Faultner; plaintiffs might have sued Faultner in tort alone for his failure to take reasonable precautions against fire. However, Faultner was an independent contractor, whose negligence ordinarily could not have been attributed to Southwest. Plaintiffs attempted to overcome this hurdle by asserting that Southwest had assumed and neglected a nondelegable contractual responsibility for the fire prevention activities of employees and subcontractors alike. This contract was therefore an essential medium for plaintiffs' assertion of a tort claim against Southwest.

Moreover, a number of plaintiffs in the consolidated underlying cases sought fees against both defendants under 12–341.-01(A). That plaintiffs' counsel has never abandoned these claims weakens his present argument that the statute does not apply. We conclude that the statute permits a fee award, and we remand to permit the trial court to determine, in its statutory discretion, whether to award fees for services in that court.

■ We further conclude, however, in the exercise of our statutory discretion, that fees should not be awarded on appeal. Though plaintiffs invoked contract provisions in their pleadings, these related to fire prevention and suppression, and served essentially to define a negligence standard of reasonable care—a standard that defendants' conduct fell below. Defendants won the decisive battles in this lawsuit wholly on tort ground, first on the issue of *res ipsa loquitur* and now on the issue of causation. The trial court, though wrong in concluding that fees could not be awarded, correctly defined this as essentially a tort case. For that reason, we decline to award fees on appeal.

## CONCLUSION

The judgment of the trial court is affirmed on the merits, but we remand the issue of attorneys' fees.

EHRLICH, P.J., and TAYLOR, J., concur.